**Willie COOK et al., Plaintiffs-Appellants,**

v.

**The BIRMINGHAM NEWS et al.,
Defendants-Appellees.**

No. 78–3096.

United States Court of Appeals,
Fifth Circuit.

June 13, 1980.

Robert L. Wiggins, Jr., Birmingham, Ala., for plaintiffs-appellants.

Marilyn S. G. Urwitz, Lutz Alexander Prager, Equal Employment Opportunity Commission, Washington, D. C., for amicus curiae.

Johnston, Barton, Proctor, Swedlaw & Naff, Hubert A. Grissom, Jr., Birmingham, Ala., for the Birmingham News Co.

Adair, Goldthwaite, Stanford & Daniel, Patrick M. Scanlon, James B. Coppess, Atlanta, Ga., for the Birmingham Printing Pressmen's Union No. 55.

Coretti, Newsom & Rogers, N. Daniel Rogers, Jr., Samuel Maples, Birmingham, Ala., for International Brotherhood of Electrical Workers.

Edward J. Fillenwarth, Indianapolis, Ind., for International Mailers Union.

Before TJOFLAT and SAM D. JOHNSON, Circuit Judges, and SEAR*, District Judge.

TJOFLAT, Circuit Judge:

This is an appeal from the order of the United States District Court for the Northern District of Alabama "clarifying" the consent decree of March 25, 1975, entered by that court in a Title VII[1] class action involving the parties to this appeal. Because we find that the district court lacked jurisdiction to entertain the motion for clarification of the decree, we vacate the order.

## I

The appellants in the present proceedings are black employees of the Birmingham News Company (Company) who were plaintiffs in the Title VII class action. They filed the complaint in that suit on May 25, 1973, naming as defendants the Company and seven historically all-white newspaper workers' unions. The complaint alleged that the defendants had violated Title VII by engaging in numerous racially discriminatory practices that had the effect of locking black employees into the lowest paying and most undesirable jobs at the Company. Record at 4. On March 25, 1975, after substantial discovery and after members of the plaintiff class had been notified, the district court entered a consent decree without objection by any party.

The consent decree recites that the Company has taken "substantial, meaningful, and effective measures" to improve the employment opportunities of its black employees. Record at 20. It then states:

8. *EQUAL EMPLOYMENT GOALS.* . . . In consideration of these factors, the Court declines plaintiffs' prayer for injunctive relief and adopts the parties' recommendations of equal employment goals to be pursued by the Company in good faith, as follows: To the end that the number of blacks employed as Apprentices and Over The Road Drivers for Mercury Express [a Birmingham News subsidiary] will continue to be increased.

9. *COLLECTIVE BARGAINING AGREEMENTS.* This Decree shall not alter or effect [sic] the terms of existing or future collective bargaining agreements between the company and the defendant unions except as such terms may be in conflict with the terms of this Decree or the provisions of Title VII of the Civil Rights Act of 1964.

10. *BACK PAY.* Those members of the plaintiff class . . . are deemed entitled to an award of back pay. The company and plaintiffs have agreed as to the identity of those so entitled and the amounts due each.

11. *ATTORNEY FEES AND COSTS.* The Company shall pay plaintiffs' counsel a reasonable attorney's fee and counsel's costs in an amount to be agreed upon by the parties.

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

1. Civil Rights Act of 1964, codified at 42 U.S.C. §§ 2000e to 2000e–17 (1976).

*Id.* at 20–21. The decree purports to be "a full and final adjudication on the merits of all claims of systemic racial discrimination which have or might have been asserted on behalf of the class in this action, and of the claims of racial discrimination asserted by the plaintiffs individually named herein." *Id.* at 20.

In August 1975, five months after the entry of the consent decree, several black employees of the Company complained to their employer that the "union priority" system governing employees' selection of days off, shifts, and vacation schedules was unfair to black employees. The union priority system had been established through collective bargaining. An employee's union priority reflected the length of time he had been a journeyman member of the union that had jurisdiction over the department in which he worked. Since the unions had traditionally excluded all blacks, black employees had been unable to establish priority over white union members who had worked for the company for a shorter time. In response to the complaints, the Company informed its black employees and the unions that black employees would be given the opportunity to claim "company seniority" based on the total time they had worked for the Company.

The record does not reveal the number of black employees who responded to the Company's announcement and claimed their company seniority in selecting days off, shifts, and vacation schedules. In September 1977, Willie Cook and Curley Kemp, black pressroom employees who had previously declined to assert their company seniority, indicated that they had decided to take advantage of that seniority. Beginning on October 3, 1977, the Company permitted them to do so. Consequently, they moved up the pressroom seniority ladder from the thirty-second and thirty-third positions to the third and fifth positions.

On July 10, 1978, the Birmingham Printing Pressmen's Union Local No. 55 (Union), responded to this change in seniority rankings by moving the district court to "clarify" the consent decree. The motion asked the court to rule that the consent decree did not authorize the Company to depart from the Union priority system that had been established through collective bargaining. The court granted the motion, enjoining the Company "from enforcing any seniority system other than that under the applicable collective bargaining agreements as interpreted and applied . . . " *Id.* at 58.

Cook and other black employees, acting individually and as representatives of the plaintiff class that had instituted the Title VII suit, brought this appeal from the district court's order.

## II

Courts of equity have long recognized and exercised a power to modify or set aside their injunctive decrees in the light of changed circumstances. Justice Cardozo summed up this equitable power in *Unites States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932):

> We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions, though it was entered by consent. . . .
> Power to modify the decree was reserved by its very terms, and so from the beginning went hand in hand with its restraints. If the reservation had been omitted, power there still would be by force of principles inherent in the jurisdiction of the chancery. A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.

The procedure for obtaining the equitable relief that Justice Cardozo described was codified in the Federal Rules of Civil Procedure in 1948 with the adoption of rule 60(b)(5). The rule permits a court to grant relief from a final judgment when "the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application." It is the final ground for relief that is based on the equitable doctrine set out in *Swift. See* 11 C. Wright & A. Miller, Federal Practice and Procedure § 2863 (1973).

Generally a rule 60(b)(5) motion founded on the inequity of the continuing operation of a judgment asks the district court to "modify" or "vacate" the judgment. The Union urges that the cases dealing with a court's power to modify or set aside a consent decree are inapplicable since the Union asked the district court only to "interpret" or "clarify" the decree. It makes no difference, in our view, that the motion was framed in terms of "clarification" rather than "modification." Courts have entertained motions under rule 60 to "clarify" judgments without distinguishing them from motions to modify or set aside judgments. *See, e. g., Arkansas Community Organization for Reform Now v. Coleman,* 531 F.2d 864, 867 (8th Cir. 1976). Even if the Union's motion did not explicitly request an alteration of the rights of the parties to the decree, it certainly asked the court to "modify" the decree by interpreting definitively terms of the decree—and, in effect, rights of the parties—that were previously unclear. Moreover, if Fed.R. Civ.P. 60 is inapplicable, we know of no legal doctrine or rule of civil procedure that even arguably could have empowered a district court to hear, three years after entry of a consent decree that acts as a final judgment, a motion to reconsider the decree. Although the Union's motion was not framed as a rule 60(b) motion [2], we conclude that the district court must have treated the proceeding as such. *See Chance v. Board of Examiners,* 561 F.2d 1079, 1086 n. 16 (2d Cir. 1977); *cf. Bros Inc. v. W. E. Grace Manufacturing Co.,* 320 F.2d 594, 606–08 (5th Cir. 1963) (court treated motion denominated as under Fed.R.Civ.P. 59 as the equivalent of one under rule 60(b)).

 Like the traditional equity rule on which it is based, rule 60(b)(5) applies only to judgments that have prospective effect "as contrasted with those that offer a present remedy for a past wrong." 11 C. Wright & A. Miller, Federal Practice and Procedure § 2863 at 205 (footnote omitted).

As Justice Cardozo pointed out in *Swift,* "The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative." 286 U.S. at 114, 52 S.Ct. at 462. Any continuing injunction, for example, would have the requisite prospective effect.

 The consent decree at issue in the present case does not have the prospective effect or continuing operation that the rule requires. After noting that the Company has taken measures to improve the employment opportunities of its black employees, the decree states simply that the district court accepts "the parties' recommendations of equal employment goals to be pursued by the Company in good faith, as follows: To the end that the number of blacks employed as Apprentices and Over The Road Drivers . . . will continue to be increased." *See* p. 1150 *supra.* This agreement is unenforceably vague. There are no guidelines in terms of time limitations or "target" numbers that would permit a court to assess the Company's efforts in pursuit of the "goal." Nor does the decree give any hint about what, specifically, the Company is expected to do in observance of the decree. No court could effectively "supervise" the parties' compliance with such an uncertain agreement. Moreover, if the decree actually made it mandatory that the Company take some specific action, then the consent decree would certainly be "injunctive" in both form and effect. The decree expressly states, however, that the court "declines plaintiffs' prayer for injunctive relief." *Id.*

 Even the decree's provision concerning back pay is equivocal. Not only does the provision fail to set out the amount of back pay due the plaintiffs or the manner in which it is to be calculated, it avoids actually ordering the Company to pay anything at all. Rather, it merely announces

---

**2.** Neither the motion nor the court order mentions a rule of civil procedure or any other source of authority.

that plaintiffs are "deemed entitled" to back pay. *Id.*[3]

One further indication that the decree should not be regarded as a continuing injunction is that the court, unlike the district court that had approved the decree at issue in the *Swift* case, did not state that it reserved power to modify the decree or that it retained jurisdiction over the case. *See* p. 1151 *supra.* It would have been natural for the decree to have contained such a provision if it had been intended that the court supervise the parties' compliance.

Although rule 60(b)(5) is to be construed liberally to prevent injustice, *In re Casco Chemical Co.*, 335 F.2d 645, 651 n. 18 (5th Cir. 1964), courts must also take account of a competing policy also embodied in the rule—the need to achieve finality in litigation. 7 Moore's Federal Practice ¶ 60.27[1] at 340 (1979). Thus, we cannot ignore the plain language of rule 60(b)(5) permitting relief from the inequitable operation of a judgment only when the judgment operates prospectively. Because the decree cannot reasonably be read to have any prospective effect, the district court had no jurisdiction to clarify or modify the decree under rule 60(b)(5).[4] As there is no other statutory or common law principle that might have empowered the district court to issue the order clarifying the consent decree, the order must be vacated.[5]

ORDER VACATED.

3. We mention this feature of the decree only to underline the overall irresolute tone of the language. Even if the decree unambiguously told the Company to award back pay, the district court would not have had jurisdiction to reconsider the decree pursuant to rule 60(b)(5), since a back pay award is a "present" rather than a "prospective" remedy. The only truly mandatory language in the decree concerns attorney's fees: "The Company *shall pay* plaintiffs' counsel a reasonable attorney's fee . . .." (Emphasis added.) *See* p. 1150 *supra.* Of course this provision creates only a "present" obligation that does not bring the decree within the terms of rule 60(b)(5).

4. For the same reason, the district court had no power to issue the order under rule 60(b)(6),

the residual clause of the rule. That provision permits a court to grant relief from a final judgment for "any other reason justifying relief from the operation of the judgment." Since the consent decree has no prospective application, it certainly had no "operation," as required by rule 60(b)(6), at the time the pressmen filed their motion.

5. We do not mean to suggest that the consent decree is immune to legal challenge; for example, rule 60(b) expressly provides that the rule "does not limit the power of a court to entertain an independent action to relieve a party from a judgment . . . or to set aside a judgment for fraud upon the court."