Ricky WYATT, By and Through his aunt and legal guardian Mrs. W.C. RAWLINS, Jr., et al., Plaintiffs,

Diane Martin, et al., Plaintiffs–Intervenors,

v.

Royce G. KING, as Commissioner of Mental Health and Mental Retardation, and the State of Alabama Mental Health Officer, et al., Defendants,

United States of America, et al., Amici Curiae.

Civ. A. No. 3195–N.

United States District Court, M.D. Alabama, N.D.

Sept. 11, 1992.

---

Ira Burnim, Washington, D.C., for proposed intervenor Bretz.

R. Emmett Poundstone, III and Ricky Trawick, Alabama Dept. of Mental Health, Montgomery, Ala., for Horsley and Dept. of Mental Health.

Andrew J. Barrick and Mitchell W. Dale, U.S. Dept. of Justice, Civil Rights Div., Washington, D.C., for U.S.

Byrd R. Latham, Patton, Latham, Legge & Cole, Athens, Ala., for Gunter, Steagall and Brassell.

Joel Kline, Christopher Cerf, Washington, D.C., for Dept. of Mental Health & Horsley.

David Ferleger, Philadelphia, Pa., for intervenors Martin, et al.

Reuben Cook, Edward Stevens, Victoria Farr, and Donald Tipper, Ala. Disabilities Advocacy, Tuscaloosa, Ala., for intervenors Martin, et al.

Peter G. Thompson, Sandra Lord, Washington, D.C., for plaintiff.

Pamel Chen, U.S. Dept. of Justice, Civ. Rights Div., Sp. Litigation Section, Washington, D.C., for amicus curiae U.S.

Algert Agricola, Mark Montiel, and David Byrne, Montgomery, Ala., for State defendants.

R. David Christy, Montgomery, Ala., for Horsley.

## ORDER

MYRON H. THOMPSON, Chief Judge.

The plaintiffs in this case first sued officials of the State of Alabama over 20 years ago claiming that conditions at facilities operated by the Alabama Department of Mental Health and Mental Retardation violated residents' rights under state and federal law. Six years ago, on September 22, 1986, the court approved a consent decree which resolved the parties' continued conflicts over the adequacy of the state's funding and administration of facilities for the mentally ill and mentally retarded under court-ordered standards. The cause is again before the court, this time on two motions filed by the defendants requesting that the court modify the 1986 decree in several respects. The defendants seek to have eliminated those provisions that, among other things, establish patients'

rights to dignity, privacy, and humane care and require that treatment be provided in the least restrictive environment. For the reasons that follow, the court concludes that the defendants' motions should be denied.

## I. BACKGROUND

In 1972, after finding that conditions in state institutions for the mentally ill and mentally retarded violated patients' constitutional rights, this court entered injunctions requiring the defendants to bring state facilities into compliance with certain minimal constitutional standards. *Wyatt v. Stickney*, 344 F.Supp. 373 (M.D.Ala.1972) (Johnson, J.) (standards for the mentally ill, hereinafter referred to as "MI Standards"), *aff'd in relevant part*, 503 F.2d 1305 (5th Cir.1974); *Wyatt v. Stickney*, 344 F.Supp. 387 (M.D.Ala.1972) (Johnson, J.) (standards for the mentally retarded, hereinafter referred to as "MR Standards"), *aff'd in relevant part*, 503 F.2d 1305 (5th Cir.1974). In these and earlier orders, *see also Wyatt v. Stickney*, 334 F.Supp. 1341 (M.D.Ala. 1971) (Johnson, J.), the court criticized numerous aspects of the state system, from the inadequate staffing to the dangerous and unsanitary physical conditions; among the court's chief concerns, however, was the lack of "a humane psychological and physical environment." 344 F.Supp. at 375; 334 F.Supp. at 1343. The court found the almost total lack of privacy in the institutions to be "dehumanizing" for patients, and aspects of patient care, including the admissions procedure, "degrading" and "humiliating." 334 F.Supp. at 1343; *see also* 344 F.Supp. at 375. With the assistance of the parties and experts in the fields of mental health and mental retardation, the court developed detailed standards, now known as the *Wyatt* standards, designed to remedy these and other serious constitutional violations that the court had discovered in the state system. 344 F.Supp. at 379–86, 392, 394–407.

In 1975, the parties returned to court to determine whether the defendants had complied with the standards established in the 1972 orders. Approximately four years later, after it had become clear that constitutional violations persisted, the court appointed the Governor of Alabama as receiver of the state system and approved the Governor's proposed plan of compliance. The Governor's plan provided that the defendants would achieve compliance with all *Wyatt* standards, with certain limited exceptions, within 18 months.

The plaintiffs again returned to court in 1981 seeking to ensure that the *Wyatt* standards were fully implemented, as required by the Governor's compliance plan. In response, the defendants moved the court to modify the 1972 orders by eliminating all of the *Wyatt* standards, thus relieving the defendants of any obligation to comply with these standards, and substituting in their place a requirement that the defendants achieve accreditation of the state's mental illness facilities by the Joint Commission on the Accreditation of Healthcare Organizations and certification of the mental retardation facilities through Title XIX of the Social Security Act.

In July 1986, the parties submitted to the court a proposed consent decree resolving all outstanding disputes between the parties. On September 22, 1986, after having given notice of the proposed decree to the plaintiff class and after having conducted a hearing on the objections to the decree, the court entered an order and memorandum opinion approving the decree.[1] Under the terms of the consent decree, the receivership was dissolved and the Alabama Mental Health and Mental Retardation System freed from active judicial supervision. The decree further provided that all prior orders and standards issued by the court regarding the obligations of the state system were to remain in full force and effect and that the defendants would "continue to make substantial progress in achieving compliance" with these orders and standards. Consent Decree of Sept. 22, 1986,

---

**1.** The unreported consent decree and accompanying memorandum opinion may be found at

1986 WL 69194.

at ¶¶ 6, 7. The defendants also agreed "to continue to make substantial progress in placing members of the plaintiff class in community facilities and programs," and "to make all reasonable efforts to achieve full accreditation of Alabama's mental health facilities ... and full certification of Alabama's mental retardation facilities." *Id.* at ¶¶ 8, 9.

On January 18, 1991, the defendants moved the court for a finding that they had met their obligations under the 1986 consent decree and for an order terminating the lawsuit. In response to the motion and by agreement of the parties, the court appointed an expert to "investigate and report to the Court and the parties ... [t]he factual issues pertaining to defendants' compliance with the outstanding orders of the Court." Parties' Agreement of April 15, 1991.[2] The court-appointed expert is now in the process of conducting his investigation.

On April 19 and 26, 1991, while the motion to terminate this litigation was pending, the defendants filed the two motions now at issue requesting that the court modify the consent decree. The defendants seek the elimination of numerous provisions in the original *Wyatt* standards, as these standards are applied through the decree, as well as the elimination of one paragraph of the decree itself.[3] The proposed "modifications" fall within four basic groups. First, defendants would have the court eliminate any reference in the *Wyatt* standards to a requirement that patients receive treatment in the least restrictive conditions necessary.[4] Second, the defen-

---

2. *See also* Order of July 2, 1991 (approving and adopting April 15 agreement); Order of Oct. 25, 1991 (approving and adopting modification of April 15 agreement).

3. As an alternative remedy, should the court find that the defendants' motions to modify are legally sound but conclude that elimination of these provisions would be inappropriate, the defendants ask that the court modify the decree by adding language to specify that all existing court orders and standards, including the *Wyatt* standards, "shall be deemed satisfied by the exercise of judgment of a qualified professional considering treatment and placement alternatives that are presently available to defendants." The defendants apparently derive this language from the Supreme Court's ruling in *Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982), that, in determining the constitutional adequacy of care in state facilities, treatment decisions made by a qualified professional are entitled to a presumption of correctness. Under *Romeo*, this presumption may be rebutted by evidence that the professional's decision represents "a substantial departure from accepted professional judgment." *Id.* Because the court finds that the defendants have failed to present sufficient evidence in support of the motion to modify, there is no need for the court to consider this alternative remedy.

4. Specifically, defendants ask the court to delete the following provisions from the standards governing facilities for the mentally ill:

(a) the statement that "patients have a right to the least restrictive conditions necessary to achieve the purposes of commitment" (MI Standard II–2);

(b) the requirement that each patient's individualized treatment plan contain "a state- ment of the least restrictive conditions necessary to achieve the purposes of commitment" (MI Standard IV–26(b)), as well as "criteria for release to less restrictive treatment conditions" (included in MI Standard IV–26(f)); and

(c) the requirement that the staff member supervising implementation of the treatment plan "shall also be responsible for ensuring that the patient is released, where appropriate, into a less restrictive form of treatment" (included in MI Standard IV–28).

The defendants would similarly delete the following provisions from the standards governing care to the mentally retarded:

(a) the requirement that "no person shall be admitted to the institution unless a prior determination shall have been made that residence in the institution is the least restrictive habilitation setting feasible for that person" (MR Standard II–3(a));

(b) the requirement that "no mentally retarded person shall be admitted to the institution if services and programs in the community can afford adequate habilitation to such person" (MR Standard II–3(b));

(c) the requirement that each resident's individualized treatment plan shall contain "a statement of the least restrictive setting for habilitation necessary to achieve the habilitation goals of the resident" (MR Standard III–9(d)), and "criteria for release to less restrictive settings for habilitation" (included in MR Standard III–9(f)); and

(d) the requirement that the staff member supervising implementation of the treatment plan "shall also be responsible for ensuring that the patient is released when appropriate to a less restrictive habilitation setting" (included in MR Standard III–11).

dants would eliminate the *Wyatt* standard which recognizes the rights of each mentally retarded person confined in a state facility "to a habilitation program which will maximize his human abilities and enhance his ability to cope with his environment." [5] Third, defendants seek elimination of that provision in the consent decree which requires the defendants "to continue to make substantial progress in placing members of the plaintiff class in community facilities and programs." Consent Decree of Sept. 22, 1986, at ¶ 9. Fourth and finally, the defendants ask that this court eliminate those *Wyatt* standards which establish that patients involuntarily committed to state facilities for the mentally ill or mentally retarded have a right to privacy, dignity, and humane care.[6]

The defendants submit three arguments in support of these modifications. First, the defendants contend that modification of the 1986 consent decree is "necessary" because the decree currently imposes upon the State of Alabama standards of care which exceed minimal constitutional standards. Second, the defendants argue that the vagueness of certain decree provisions warrants modification. Finally, they claim that the defendants' record of compliance justifies modification of the decree.

## II. STANDARD FOR MODIFICATION OF A CONSENT DECREE

▮ The parties do not dispute that a district court retains the power to modify a decree of injunctive relief where changed conditions make continued application of the decree inequitable. *Rufo v. Inmates of Suffolk County*, 502 U.S. ——, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). A consent decree, although it represents a settlement agreement voluntarily adopted by the parties, is nonetheless a judicial decree approved and enforced by the court and is thus subject to modification according to

the same rules generally applicable to other judgments and decrees. *Id.*

For many years, parties seeking modification of a consent decree were held to the rigorous test established in *United States v. Swift*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). In *Swift*, an antitrust action brought against the giants of the meatpacking industry was resolved through entry of a consent decree. Ten years after the original decree was entered, two of the defendants sought relief from the decree's prohibition on their expansion into the grocery business on grounds that, with the passage of time, they no longer posed an unlawful threat to competition. The Supreme Court denied the requested modification. The Court acknowledged the changes that had occurred in the grocery industry but found that the dangers which warranted entry of the original decree had not subsided and that the defendants had failed to demonstrate that continued enforcement of the decree would cause them undue hardship. Announcing the rule that was to prevail for the next 50 years, the Court held that, "Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned." *Id.* at 119, 52 S.Ct. at 464. A subsequent case, *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 249, 88 S.Ct. 1496, 1500, 20 L.Ed.2d 562 (1968), endorsed the application of the "grievous wrong" standard in *Swift* but suggested that a more lenient standard should apply when the modification was sought by a party not seeking to evade its obligations under the decree, as in *Swift*, but because the passage of time revealed that modification was necessary to achieve the purposes of the decree.

More recently, as courts have made increasing use of consent decrees as a means of implementing structural reform, several circuits—including the Eleventh Circuit

---

**5.** MR Standard II-2.

**6.** Although recognition of these rights is implicit in many of the *Wyatt* standards, the defendants seek to eliminate two standards in particular:

(a) "Patients have a right to privacy and dignity" (MI Standard II-1); and
(b) "Residents shall have a right to dignity, privacy and humane care" (MR Standard IV-15).

Court of Appeals—have suggested that a more flexible standard than *Swift*'s should apply to consent decrees that arise out of "institutional reform litigation." *See, e.g., Hodge v. HUD,* 862 F.2d 859 (11th Cir.1989) (per curiam); *New York State Ass'n for Retarded Children, Inc. v. Carey,* 706 F.2d 956 (2d Cir.), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983); *Philadelphia Welfare Rights Org. v. Shapp,* 602 F.2d 1114 (3d Cir.1979), *cert. denied.* 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980). In light of the detailed provisions of some of these decrees and the likelihood that they will remain in effect for a substantial period of time, these courts agreed that "judicially-imposed remedies must be open to adaptation when unforeseen obstacles present themselves, to improvement when a better understanding of the problem emerges, and to accommodation of a wider constellation of interests than is represented in the adversarial setting of the courtroom." *Carey,* 706 F.2d at 969; *see also Hodge,* 862 F.2d at 863 (quoting *Carey* ). In *Carey,* for example, the court approved modification without requiring a showing of "grievous wrong" where the passage of time revealed that the decree was not achieving its desired purpose and that revisions were necessary to ensure realization of the goals of the decree.[7] *Carey,* 706 F.2d at 971 (approving modification of size of community facilities used to house patients if modification would further decree's primary goal of emptying institution at issue). The critical question for these courts is whether the proposed modification would further the primary goals of the decree. *Hodge,* 862 F.2d at 864 (court focuses on underlying purpose of the decree); *Carey,* 706 F.2d at 969 (same).

This last term, in *Rufo v. Inmates of Suffolk County,* 502 U.S. ——, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the Supreme Court confirmed that parties need not demonstrate "grievous injury" to obtain modification of a consent decree that is designed to effect structural reform. *Rufo* involved a challenge brought by pretrial detainees to conditions in the county jail where they were confined. In 1971, the district court entered a final order holding that conditions at the jail violated the plaintiffs' constitutional rights and enjoining the government to make certain improvements. In particular, the court's decree forbade double bunking of pretrial detainees. Problems persisted, however, and in 1977 the court instructed the defendants to develop a plan for a new jail or face immediate closure of the old facility. In response to the court's order, the parties eventually entered into a consent decree in which the defendants agreed to construct a new jail in accordance with a specific architectural plan.

During the years following the entry of the decree and throughout the period of construction, the number of pretrial detainees continued to outpace the government's projections. In 1989, with the new jail six years behind schedule and construction still not completed, the government moved for modification of the decree to allow for double bunking in some cells in order to accommodate the expanded number of inmates. The district court denied the motion, finding that the government had failed to show a change of circumstances sufficient to justify modification under *Swift.* The First Circuit Court of Appeals affirmed.

The Supreme Court held that the district court had erred in applying the *Swift* standard to institutional reform litigation. The Court first confirmed that modification of a consent decree, like modification of any other judgment, is governed by Rule 60(b) of the Federal Rules of Civil Procedure. Rule 60(b)(5) authorizes a court to modify a final judgment or court order if it finds that "the judgment has been satisfied, ... or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application." This

7. In a related development in another case, the Supreme Court recently held that the *Swift* "grievous wrong" standard does not apply to a motion seeking to dissolve a school desegregation decree where there has been full compliance over a period of time. *Board of Educ. of Oklahoma City Public Schools v. Dowell,* 498 U.S. 237, ——, 111 S.Ct. 630, 636–37, 112 L.Ed.2d 715 (1991).

authority is supplemented by a catch-all provision which permits modification for "any other reason justifying relief from the operation of the judgment." Fed.R.Civ.P. 60(b)(6). The district court had found that Rule 60(b), adopted as part of the Federal Rules of Civil Procedure in 1937, sought to codify the same "grievous wrong" standard applied in *Swift*. 502 U.S. at ——, 112 S.Ct. at 757. The Supreme Court found that the district court misconstrued *Swift* by reading the seemingly rigid "grievous injury" language out of context. *Id.* The Court held that, interpreted correctly, the *Swift* decision itself recognized that a different standard would appropriately apply to decrees "that involve the supervision of changing conduct or conditions and are thus provisional and tentative" than to those decrees addressed to situations in which "the facts [are] so nearly permanent as to be substantially impervious to change." *Id.* at ——, 112 S.Ct. at 758 (quoting *Swift*, 286 U.S. at 114–15, 52 S.Ct. at 462). Because the *Swift* decision itself recognized the need for different standards in different situations, the Court reasoned, it would be unlikely that the drafters of Rule 60(b) misread. *Swift* and intended that modification of a consent decree should in all cases be governed by the rigid standard applied in that case.[8] *Id.*

 In place of the "grievous injury" test, the *Rufo* decision establishes a flexible, two-part standard for modification of a consent decree arising out of institutional reform litigation.[9] *Rufo*, 502 U.S. at ——, 112 S.Ct. at 760. First, the party seeking modification of the decree "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id.* The party may satisfy this initial burden "by showing either a significant change in factual conditions or in law." *Id.* The Court identified three situations in which a change in factual conditions could warrant modification of a decree. Modification could be appropriate where a change in conditions has made compliance with the decree "substantially more onerous." *Id.* Alternatively, modification could be appropriate "when a decree proves unworkable because of unforeseen obstacles" or, lastly, "when enforcement of the decree without modification would be detrimental to the public interest." *Id.* While the change in circumstances need not have been unforeseeable, it must at least have been unforeseen: "Ordinarily, ... modification should not be granted where a party relies upon events that actually were

---

**8.** In *Newman v. Graddick*, 740 F.2d 1513, 1520 (11th Cir.1984), the Eleventh Circuit Court of Appeals similarly concluded that *Swift* should be read as establishing two different standards for modification of a consent decree: one rigid, one more flexible. As the court subsequently recognized in *Hodge*, however, this is not the most persuasive interpretation of Justice Cardozo's language. The *Swift* language at issue appears in the following paragraph:

"We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions, though it was entered by consent.... A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need. The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative. 
\* \* \* \* \* \* 
"Power to modify existing, we are brought to the question whether enough has been shown to justify its exercise."

*Swift*, 286 U.S. at 114–15, 52 S.Ct. at 462 (citation omitted). "Because the language ... appears in a paragraph concerned with the court's power to modify (as opposed to the showing needed to justify the court's exercise of that power, a subject dealt with in succeeding paragraphs)," the distinction drawn would appear to refer not to two different standards for modification, but rather to decrees which are not subject to modification *at all* and those which, because they involve the supervision of changing conduct, must be open to modification. *Hodge*, 862 F.2d at 863.

While questioning *Newman's* analysis of *Swift*, the *Hodge* court endorsed that court's ultimate holding: that a more lenient standard should apply to modification of a continuing decree intended to effect institutional reform.

**9.** In discussing the standard for modification of a consent decree, the Court discusses Rule 60(b) in general without distinguishing between subparts (5) and (6)..

anticipated at the time it entered into a decree." *Id.* Before the court will grant a requested modification on the basis of an alleged change in law, the party seeking modification must show either that one or more of the obligations the decree imposes upon the parties has been made impermissible under federal law or that the law has changed to make legal what the decree was designed to prevent. *Id.* at ——, 112 S.Ct. at 762.

■ Second, if the moving party meets this standard, the court then considers "whether the proposed modification is suitably tailored to the changed circumstance." *Id.* at ——, 112 S.Ct. at 760. Any modification to the decree must be directly responsive to the problem created by the changed circumstances; "[a] proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor." *Id.* at ——, 112 S.Ct. at 764.

■ The *Rufo* decision also recognized that, in applying the two-part standard, a court must determine and keep in mind the underlying purpose of the consent decree. If, for example, a defendant seeks a modification which clearly and undoubtedly furthers the decree's purpose, the court might be less demanding of the defendant; indeed, in such an extreme circumstance, the plaintiff would probably not oppose the modification. Or if the proposed modification concerns only minor changes or extraneous details unrelated to the decree's purpose, the court need not even apply the *Rufo* two-part standard. *Id.* at —— n. 7, 112 S.Ct. at 760 n. 7. But if the modification would in any manner frustrate or undermine the decree's purpose, the court should, of course, proceed with extreme caution in applying the *Rufo* two-part standard. *Rufo*, 502 U.S. at ——, 112 S.Ct. at 762; *see also Hodge*, 862 F.2d at 864.

## III. DISCUSSION

Although the defendants do not identify Rule 60(b) as the authority for their motions to modify, no other procedural rule would entitle them to the relief they seek. The court therefore evaluates the motions by the standards of Rule 60(b) as set forth

in *Rufo*. First, the court considers the underlying purpose of the 1986 consent decree. *Rufo*, 502 U.S. at ——, 112 S.Ct. at 762; *Hodge*, 862 F.2d at 859. The court then addresses the fundamental prerequisite for modification: whether the defendants have identified a "significant change in factual conditions or in law" that warrants revision of the consent decree, *Rufo*, 502 U.S. at ——, 112 S.Ct. at 760; without such a showing, the court has no authority to reopen a judgment which has been settled for almost six years. Considering first the question of any changes in the relevant law and next the changes in the factual circumstances surrounding implementation of the decree, the court finds no evidence of a change sufficiently significant to warrant modification of the decree.

### A. The purpose of the 1986 consent decree

In *Rufo*, the Supreme Court gave the consent decree a very broad reading. The *Rufo* litigation challenged unconditional conditions in the county jail; as a remedy, the decree specifically prohibited double bunking of pretrial detainees. The Supreme Court concluded that, despite the language of the decree, permitting double bunking would not violate the "basic purpose" of the decree because that purpose "was to provide a remedy for what had been found ... to be unconstitutional conditions." *Rufo*, 502 U.S. at ——, 112 S.Ct. at 762.

In this case, the history leading up to the adoption of the 1986 consent decree confirms that the underlying purpose of the decree was not simply to establish the plaintiffs' rights to constitutionally adequate services. That claim had been litigated in 1972 and resolved in favor of the plaintiffs. In 1986, the parties' dispute focussed instead on three different issues: (1) the defendants' request to terminate court supervision of the state system; (2) the plaintiffs' concern about the continued viability of the *Wyatt* standards; and (3) the plaintiffs' efforts to expand the focus of the litigation to the provision of community placements. The final decree reflects

a balancing of these concerns, and the memorandum opinion which accompanied the decree further underscores the trade-offs that have been made by each side in order to reach this compromise. In the accompanying memorandum opinion, the court wrote:

> "To be sure, the settlement here offers both substantial pluses and substantial minuses for the plaintiff class.... The first significant plus is that the settlement preserves the integrity and force of the court's prior historic standards and orders. This settlement provision may not appear at first blush to be that significant and substantial, but it is. After the initiation of the last round of litigation, which was in substantial part a vigorous frontal attack by the defendants on the continued validity of the court's prior standards and orders, a number of appellate decisions cast substantial doubt on whether these standards and orders could withstand the challenge. *See, e.g., Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Newman v. Graddick,* 740 F.2d 1513 (11th Cir.1984). As both the plaintiffs and the defendants now correctly observe, the incorporation of these standards into a settlement makes these standards and orders unsusceptible to challenges because of present and future changes in the law. Without question, one of the most significant things bargained away by the defendants in order to secure the plaintiffs' approval of the settlement is the defendants' vigorously asserted and often repeated contention that the court's prior standards and orders are always subject to attack because of present and future changes in the law."

The court continued that,

> "But perhaps most importantly, the settlement achieves something the plaintiffs were unable to achieve in the past: it substantially broadens the focus of the litigation to include community placement and requires that the defendants make substantial progress in placing people in the community."

Memorandum Opinion of Sept. 22, 1986 at 8–9.

The modifications currently proposed by the defendants conflict with two of the decree's basic goals and, not surprisingly, these are the two goals which further the plaintiffs' cause. The modifications would seriously erode the *Wyatt* standards and would eliminate the defendants' obligation to expand community services while retaining for the defendants all the benefits of their bargain. With this understanding, the court turns to whether the defendants have met *Rufo*'s two-part standard.

## B. *Changes in the law*

The defendants contend that the Supreme Court's decision in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), and subsequent decisions of the courts of appeals demonstrate that certain provisions of the *Wyatt* standards exceed minimal constitutional requirements. Specifically, the defendants interpret *Romeo* as a rejection of the requirement that the state use the least restrictive mode of treatment possible, and identify subsequent cases from several circuit courts which similarly dismiss the idea of a constitutional right to the least restrictive alternative. *See S.H. v. Edwards,* 860 F.2d 1045 (11th Cir.1988) (per curiam), *clarified,* 886 F.2d 292 (11th Cir.) (en banc) (per curiam), *cert. denied,* 491 U.S. 905, 109 S.Ct. 3187, 105 L.Ed.2d 696 (1989); *Hanson v. Clarke County, Iowa,* 867 F.2d 1115, 1119–1120 (8th Cir.1989); *Lelsz v. Kavanagh,* 807 F.2d 1243, 1249–51 (5th Cir.1987); *Society for Good Will to Retarded Children v. Cuomo,* 737 F.2d 1239, 1248–49 (2d Cir. 1984). The defendants contend that modification is therefore justified because the consent decree provides plaintiffs with protections that exceed minimal constitutional requirements.

▄▄▄▄▄▄ The defendants' argument suffers from two serious flaws. First, the burden lies on the defendants to identify a change in the relevant law *since* entry of the consent decree which would warrant modification of the decree. The only decisional law defendants recite as evidence of a change in law is the *Romeo* case and its

progeny. *Romeo* was decided in 1982, four years *before* the parties entered into this decree, and thus cannot serve as evidence of any change in the law. *See Rufo*, 502 U.S. at ——, 112 S.Ct. at 762 (rejecting characterization of a case as subsequent change in law in light of fact that the case was pending before the Supreme Court at time consent decree finalized). As the defendants themselves concede, the appellate cases cited do no more than clarify the application of *Romeo*. A mere "clarification" of the law does not constitute an intervening change of circumstance sufficient to justify modification of a court order or consent decree. *Id.* at ——, 112 S.Ct. at 763. To hold otherwise, as the Court observed in *Rufo*, would invite relitigation of the consent decree following every clarification of the law, undermining the finality of decrees and effectively deterring settlement in institutional reform litigation. *Id.*

The *Rufo* court did suggest that a clarification might provide grounds for modification if the parties had based their original agreement on a misunderstanding of governing law. *Id.* In *Rufo*, for example, the decree not only required that the defendants provide inmates with individual cells but further stated that the decree's requirements were "both constitutionally adequate and constitutionally *required*." [10] *Id.* (Emphasis added.) A Supreme Court decision issued after entry of the consent decree made clear that double bunking is not in all cases unconstitutional. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

In this case, however, there is no evidence .that the parties misunderstood the state of the law in 1986. At the time.of the consent decree, all the parties and the court were well aware of the possibility that certain *Wyatt* standards might not survive a constitutional attack. *See* Memorandum Opinion of Sept. 22, 1986 at 8 (noting that "a number of appellate decision cast substantial; doubt on whether these [*Wyatt*] standards could withstand the challenge"); *see also* Summary of Argument in Support of Approval of Consent Decree, filed Aug. 27, 1986 (raising same concern that standards might exceed constitutional minima). As the court observed at that time, this concern played a significant role in the plaintiffs' decision to enter into a decree which, while it ensured the continued vitality of the *Wyatt* standards,, required that they make several significant concessions in other areas.[11] Memorandum Opinion of Sept. 22, 1986 at 9. Thus, the defendants have demonstrated neither a change in law since entry of the decree nor a clarification contrary to the parties' understanding; modification is not warranted on either ground.

Second, the defendants' assertions that a consent decree cannot impose obligations upon them in excess of the constitutional minima and that, if true, entitles them to modification of the decree, are completely without merit. Twice this last term the Supreme Court reiterated that parties may agree in a consent decree to more extensive relief than a court would have ordered absent the settlement and more than the Constitution itself requires. *Rufo*, 502 U.S. at ——, 112 S.Ct. at 762–63

---

**10.** As the dissent observed, however, the decree included numerous details about the planned facility, such as the location of laundry rooms and the need for vending machines in the lobby, that the parties clearly did not believe to be "constitutionally required." *Rufo*, 502 U.S. at —— & n. 4, 112 S.Ct. at 770 & n. 4 (Stevens, J., dissenting). Thus the phrase is most sensibly construed to mean that the parties understood an adequate remedy to be constitutionally required and that the proposed plan was constitutionally adequate. *Id.*

**11.** Of course, entry of the consent decree does not immunize the *Wyatt* standards from a properly supported motion to modify. "The parties

cannot, by giving each other consideration, purchase from a court of equity a continuing injunction," *System Federation No. 91, Ry. Employees' Dept. v. Wright*, 364 U.S. 642, 651, 81 S.Ct. 368, 373, 5 L.Ed.2d 349 (1961); the court retains the power "to modify the terms of a consent decree when a change in law brings those terms in conflict with statutory objectives." *Id.*

Then, as now, however, no suggestion was made that the *Wyatt* standards conflict with the demands of the Constitution; the defendants' challenge alleges only that the certain standards exceed the constitutional minima.

("But we have no doubt that, to 'save themselves the time, expense, and inevitable risk of litigation,' petitioners could settle the dispute over the proper remedy for the constitutional violations that had been found by undertaking to do more than the Constitution itself requires (almost any affirmative decree beyond a directive to obey the Constitution necessarily does that), but also more than what a court would have ordered absent the settlement") (internal quotations and citation omitted); *id.* at ——, 112 S.Ct. at 764 ("officers in charge of institutional litigation may agree to do more than that which is minimally required by the Constitution to settle a case and avoid further litigation"); *Suter v. Artist M.,* 502 U.S. ——, ——, 112 S.Ct. 1360, 1366, 118 L.Ed.2d 1 (1992) ("parties may agree to provisions in a consent decree which exceed the requirements of federal law"); *see also Local Number 93, Internat'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 525, 106 S.Ct. 3063, 3077, 92 L.Ed.2d 405 (1986) (consent decree may "provide[ ] broader relief than the court could have awarded after a trial"). Thus, the fact that the remedy adopted by the parties in response to constitutional violations itself exceeds what the Constitution requires does not provide grounds for modification. The defendants' "constitutional arguments [are] beside the point where the [defendants] voluntarily avoided [constitutional] litigation by signing the consent decree." *Twelve John Does v. District of Columbia,* 861 F.2d 295, 301 (D.C.Cir.1988) (citation omitted). Indeed, realistically, "almost any affirmative decree beyond a directive to obey the Constitution necessarily" goes beyond minimal constitutional requirements. *Rufo,* 502 U.S. at ——, 112 S.Ct. at 762–63. While it is true, as defendants insist, that a remedy ordered by a federal court must be tailored to curing the specific constitutional violation, *see Rizzo v. Goode,* 423 U.S. 362, 378–79, 96 S.Ct. 598, 607–08, 46 L.Ed.2d 561 (1976), the remedy adopted by the parties in a consent decree need not adhere to the constitutional "floor"; rather, the requirement is satisfied as long as the relief ordered is "related to" the unconstitutional conditions. *Rufo,* 502 U.S. at ——, ——, 112 S.Ct. at 763, 764. As the *Rufo* Court observed,

> "the position urged by [the defendants] 'would necessarily imply that the only legally enforceable obligation assumed by the state under the consent decree was that of ultimately achieving minimal constitutional ... standards.... Substantively, this would do violence to the obvious intention of the parties that the decretal obligations assumed by the state were not confined to meeting minimal constitutional requirements. Procedurally, it would make necessary, as this case illustrates, a constitutional decision every time an effort was made either to enforce or modify the decree by judicial action.' "

*Id.* at ——, 112 S.Ct. at 763 (quoting *Plyler v. Evatt,* 924 F.2d 1321, 1327 (4th Cir. 1991)). Clearly, the remedy adopted by the parties in the 1986 consent decree "relates to" the unconstitutional conditions at state mental health and mental retardation facilities. The claim that its provisions exceed constitutional minima, even if accurate, would not by itself warrant modification of the decree.

### C. *Changes in factual circumstances*

Alternatively, the defendants could convince the court of the need for modification by identifying a "significant change in factual conditions" that has the effect either of making compliance with the decree "substantially more onerous," or of making enforcement of the decree without modification "unworkable" in light of "unforeseen obstacles" or "detrimental to the public interest." *Rufo,* 502 U.S. at ——, 112 S.Ct. at 760.

The only "changed" factual circumstance the defendants identify is their alleged compliance with the terms of the decree.[12] Modification upon these grounds

---

12. Defendants also appear to suggest that, regardless of whether they have actually achieved compliance with the standards, modification is justified because they have made a good faith effort to comply. The allegation that the defendants have endeavored to comply with the

is appropriate only upon a full factual record. *Hodge,* 862 F.2d at 861 (court must hold evidentiary hearing before modifying decree to remove requirements previously imposed). Here, the defendants have offered virtually no factual evidence to support the allegation of compliance. Instead, they rely entirely upon a consumer's guide to mental health services issued jointly by two private agencies which purportedly praises the Alabama state mental health system.[13] E. Torrey, K. Erdman, S. Wolfe, & L. Flynn, *Care of the Seriously Mentally Ill: A Rating of State Programs* (3d ed. 1990) (joint publication of Public Citizen Health Research Group and National Alliance for the Mentally Ill). This single citation is completely inadequate as grounds for modification. First, the report addresses only services for people with mental illness; it does not cover services for the mentally retarded. The *Wyatt* standards defendants seek to delete address both mental health and mental retardation services. Second, the focus of the report's "praise" is on Alabama's improvements and plans for the future, not on the absolute quality of care. *Id.* at 98 ("Make no mistake about it: Alabama's mental illness services are very inadequate, as are such services in every state in this country.") Third, the report does not address the *Wyatt* standards, nor does it provide sufficient information for the court to determine which, if any, of these standards have been achieved or the extent of the state's alleged compliance.

Under Eleventh Circuit law, it is questionable whether such meager evidence would warrant even an evidentiary hearing. *Newman,* 740 F.2d at 1521 (to prevent abuse and delay, court considers defendants' good faith and substantiality of alleged improvements before granting hearing on modification). In this case, moreover, additional considerations weigh against further proceedings. The question of the defendants' compliance with the consent decree has already been raised by the defendants' motion to terminate this litigation and, by agreement between the parties, the court has appointed an expert to investigate and report to the court and the parties "[t]he factual issues pertaining to defendants' compliance with the outstanding orders of the Court." Parties' Agreement of April 15, 1991. Presented with these circumstances, the court concludes that this issue would be better addressed in the context of the motion to terminate.

### D. The defendants' "vagueness" claim

■ Finally, the defendants contend that provisions of the decree should be modified because they are "vague" and thus incapable of enforcement. They rely primarily on *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), for the proposition that modification is warranted where the language of a decree is vague or ambiguous. This argument is without merit. Nothing in Rule 60(b) or relevant caselaw suggests that "vagueness" is an appropriate ground for granting relief six years after entry of a decree. The legal analysis offered to support the defendants' "vagueness" argument suffers from several serious flaws.

First, *Spangler* involved the interpretation and evaluation of a court order, not a consent decree. Because the language in the order was drafted by the district court, not by the parties, it was not unreasonable for the parties to claim difficulty in its

---

terms of the decree, while it may be a prerequisite to approval of a request for modification, *Board of Educ. v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), does not, standing alone, provide grounds for modification of the decree. On the contrary, a defendant's failure to make a good faith effort to comply could be grounds for denying a requested modification, *Duran v. Elrod,* 713 F.2d 292 (7th Cir.1983), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1615, 80 L.Ed.2d 143 (1984), and could also merit a finding of contempt. *Combs v. Ryan's Coal Co., Inc.,* 785 F.2d 970, 980 (11th Cir.), *cert. denied,* 479 U.S. 853, 107 S.Ct. 187, 93 L.Ed.2d 120 (1986).

**13.** Although the defendants failed to submit the report itself to the court, excerpts from the report were included as exhibits to the plaintiff-intervenors' brief. *See* Plaintiff–Intervenors' Brief in Opposition, filed July 5, 1991, Exh. 1 (reproducing pages 1–2, 95–98, and 179–188 of the report).

interpretation. In this case, in contrast, the purportedly "vague" terms appear in the settlement agreement prepared and adopted by the parties themselves. The court is therefore baffled by defendants' contention that, six years after its adoption (and subsequent to defendants' filing of a motion for a finding of compliance), they now find the terms in the degree hopelessly vague.

Second, *Spangler* does not bear the weight the defendants seek to place on it. Vagueness alone was not the source of the Supreme Court's concern; more important was the fact that the district court's interpretation of ambiguous language in the order was not only contrary to the understanding of the parties but contrary to intervening law. 427 U.S. at 433–34, 96 S.Ct. at 2703. It was on the basis of both of these factors that the Supreme Court concluded modification of the order would be appropriate. *Id.* at 437–38, 96 S.Ct. at 2705.

Third, none of the remaining cases cited by the defendants in support of their "vagueness" argument suggest that vagueness constitutes adequate grounds for modification of a consent decree. In *Richmond Black Police Officers Association v. City of Richmond*, 548 F.2d 123 (4th Cir.1977), the troublesome vagueness lay not in the consent decree but in a contempt citation issued by the district court.[14] The Fourth Circuit remedied this defect by vacating the contempt conviction; the decree itself was not at issue and thus remained unchanged. In *Cook v. Birmingham News*, 618 F.2d 1149 (5th Cir.1980), the court of appeals denied the defendants' motion for modification of the consent decree on grounds that the decree at issue

was not intended to operate prospectively and thus was not subject to modification under Rule 60(b). *See* 11 C. Wright & A. Miller, Federal Practice & Procedure § 2863 at 205 (rule applies to any judgment with prospective effect). Two factors supported this conclusion: first, the district court's explicit rejection of the plaintiff's request for injunctive relief; and second, the fact that the decree was framed in vague, general language which provided no guidelines, targets or time limitations that would enable a court to monitor the defendants' compliance with its terms. Significantly, the *Cook* court construed the extremely vague nature of the entire decree as evidence that modification would *not* be appropriate. In this case, because there is no doubt that the parties and the court intended the 1986 consent decree to have prospective application, *Cook*'s reasoning does not apply. Finally, in *International Longshoremen's Association v. Philadelphia Marine Trade Association*, 389 U.S. 64, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967), the Supreme Court found a district court decree unenforceable because the one-sentence decree, which simply mandated "enforcement" of a previous labor arbitration without explaining how or why the outcome of this arbitration would apply to future disputes, "left entirely unclear what it demanded," in violation of Rule 65.[15] No consent decree was involved; the challenge attacked the court's language, not the language of a consent decree.

All the terms of the 1986 consent decree have been in effect for at least six years, and the *Wyatt* standards for almost 20. The defendants identify no change in law or fact but simply assert—for the first

---

**14.** In *Richmond Black Police Officers*, the district court had found the defendants in contempt of court for violation of the consent decree. On appeal, the Fourth Circuit found the district court's contempt order ambiguous with respect to whether the defendants were charged with civil or criminal contempt. Concluding that the conviction was for criminal contempt, the appeals court vacated the conviction on grounds that the district court had failed to comply with the appropriate statutory and procedural rules which attach to a criminal contempt proceeding.

**15.** The Court took care to define the scope of the question before it: "We do not deal here with a violation of a court order by one who fully understands its meaning but chooses to ignore its mandate. We deal instead with acts alleged to violate a decree that can only be described as unintelligible." *International Longshoremen's Ass'n*, 389 U.S. at 76, 88 S.Ct. at 208.

time—that they now find the terms and standards to be so vague as to preclude compliance. No court has suggested that vagueness alone would justify a court's unusual action in reopening what is otherwise a final judgment years after the time for appeal has passed.[16] *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 911 F.2d 363, 365 (9th Cir.1990) (modification of permanent injunction is extraordinary relief).

As the court finds that, absent any change in circumstances, vagueness alone provides insufficient grounds for modification of a decree entered six years previously, the court need not address defendants' contention that the terms and standards are in fact "vague" and unenforceable. The court notes in passing, however, that this claim appears meritless. On several occasions, the defendants themselves have argued that they have successfully complied with all terms of the decree and should therefore be relieved of all further obligations. *See Combs v. Ryan's Coal Co., Inc.*, 785 F.2d 970, 979 (11th Cir.) (defendants' compliance for three months rebuts claim of vagueness), *cert. denied*, 479 U.S. 853, 107 S.Ct. 187, 93 L.Ed.2d 120 (1986). Nor have the defendants identified any problems they have had in understanding and enforcing the term of the decree. Indeed, the plaintiffs' contrary claim that

the challenged terms possess a well-understood general meaning within the mental health community is supported by the fact that a variety of states have incorporated these terms into their statutory codes. *Fox v. HUD*, 680 F.2d 315, 320 (3d Cir.1982) (words in consent decree may be interpreted with respect to their technical meaning). For example, several state statutes governing care of the mentally ill or mentally retarded refer to "the least restrictive conditions necessary to achieve the purposes of commitment [or habilitation]."[17] The phrase "a habilitation program which will maximize ... human abilities" has been adopted by various states as a requirement for programs for the mentally retarded.[18] Finally, if the defendants intend their vagueness challenge to extend also to the standards guaranteeing patients' rights to dignity, privacy, and humane treatment, these terms have similarly been accepted by other legislatures and other courts as appropriate general standards for the treatment and care of individuals confined in mental institutions.[19]

At one point in their argument, the defendants appear to suggest that, even if the terms and standards have sufficient specific meaning to be enforceable, the court should nonetheless define them more clearly. Admittedly, the terms and stan-

---

**16.** This remains true even under the more flexible standard applicable in institutional reform litigation:

> "Though courts have been increasingly willing to take efficiency and implementation experience into account in the modification analysis, there is still a need to show some change in the circumstances or an element of 'unforeseenness' surrounding the enjoined activity which has rendered the injunction unnecessary or extremely burdensome."

*Transgo, Inc. v. Ajac Transmission Parts Corp.*, 911 F.2d 363, 367 (9th Cir.1990).

**17.** *See, e.g.,* N.M.Code Ann. § 43–1–9 (1978) (each treatment plan shall include "a statement of the least restrictive conditions necessary to achieve the purposes of treatment or habilitation ..."); Mo.R.S. 630.005(18) (1991) (defining least restrictive environment as a "setting where, care, treatment, habilitation or rehabilitation is particularly suited to the level and quality of services necessary to implement a person's individualized treatment, habilitation or rehabilitation plan and to enable the person

to maximize his functioning potential to participate as freely as feasible in normal living activities, giving due consideration to potential harmful effects to the person").

**18.** *See, e.g.,* D.C.Code § 6–1961(b) (1990) ("Each resident has a right to a habilitation program which will maximize his or her human abilities."); Mont.Code Ann. § 53–20–148 (1990) ("Each resident has a right to a habilitation program which will maximize his human abilities"); *cf.* S.D.Codified Law § 27B–3–4 (1991) ("The ultimate aim of each facility [for the mentally retarded] shall be to foster those behaviors that maximize the human qualities of each resident ...").

**19.** *See, e.g.,* New Jersey Statutes § 30:4–24.2 (1990) (providing that patients in mental health institutions have a right to "privacy and dignity"); *Homeward Bound, Inc. v. Hissom Memorial Center*, No. 85–C–437–E, 1987 WL 27104 (N.D.Okla. July 24, 1987), Court Plan and Order of Deinstitutionalization at 2 ("All persons deserve to be treated with dignity").

dards are open to interpretation or clarification in the sense that all terminology and language found in caselaw and statutes are open to such as they are applied in specific factual contexts. *See, e.g., Wyatt v. King,* 781 F.Supp. 750 (M.D.Ala.1991) (Thompson, J.) (court clarified some of the procedures and standards used in court-ordered "recommitment hearings"). But until the defendants present the court with a specific need to have a term or standard interpreted or clarified, a need preferably grounded in a factual setting, it would be injudicious and impractical for the court to attempt to fine tune, or give some further legal gloss to, any language and terminology found in the 1986 consent decree or in the prior orders and standards adopted in the decree.

Because the court finds that defendants have failed to identify any change in circumstance that would warrant modification, there is no need to consider the second part of the *Rufo* test: whether the proposed modifications are "suitably tailored to the changed circumstance." *Rufo,* 502 U.S. at ——, 112 S.Ct. at 760. The court would point out, however, that the relationship between any alleged changes in circumstance and several of the defendants' proposed modifications falls somewhat short of tenuous. For example, the defendants request that the court eliminate the decree provisions which guarantee patients' rights to privacy, dignity and humane care.[20] *See Wyatt,* 344 F.Supp. at 379, 399. These rights were recognized by the district court in 1972 and reaffirmed by the court of appeals in 1974. *Wyatt v. Alderholt,* 503 F.2d 1305 (5th Cir.1974). The law of the Eleventh Circuit thus explicitly holds that mentally ill or mentally retarded patients involuntarily committed to a state institution have constitutional rights to privacy, dignity and humane care.[21] The de-

fendants identify no change in law which has thrown into doubt the continued validity of these rights, nor do they suggest what changed factual circumstances could possibly justify depriving institutionalized individuals of their rights to dignity, privacy, and humane care.

## IV. CONCLUSION

Finally, the court must admit that it is greatly baffled and deeply troubled that the defendants have singled out for elimination those *Wyatt* standards which establish that patients involuntarily committed to state facilities for the mentally ill or mentally retarded have a right to privacy, dignity, and humane care. As the United States of America aptly inquired in a friend-of-the-court brief,

> "The mere fact that defendants would propose the elimination of these right raises questions about their good faith and intent to honor the spirit of the Consent Decree. Are defendants asking that they be allowed to rob individuals committed to their institutions of their dignity, to violate their privacy or to subject them to inhumane conditions?"

The defendants never responded to this question; in fact, the brief the defendants filed in support of their requested modifications never directly addressed why these particular *Wyatt* standards should be modified or eliminated. Nevertheless, the court hopes that the answer to the federal government's question is an unequivocal "no".

Accordingly, for the reasons given above, it is the ORDER, JUDGMENT, and DECREE of the court that the motions to modify filed by defendants on April 19 and 26, 1991, be and they are hereby denied.

---

**20.** Not all of the proposed modifications fall in this category. For example, the defendants seek elimination of those portions of the decree which require that they provide care in the "least restrictive environment" and which require the defendants to make substantial progress in placing members of the plaintiff class in community facilities. Although the court has rejected the motion to modify these provisions as based on a faulty understanding of the law,

as discussed above, these proposed modifications would at least be responsive to the *alleged* changes in law defendants discuss in their brief.

**21.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (1981), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.