**Michael Leroy DOLIHITE, individually and as father and next friend of David Michael Dolihite; Joyce Mary Dolihite, Plaintiffs,**

v.

**Mary Fay VIDEON, as Executrix of the Estate of Robert Maughon, deceased; Royce G. King; R. Emmett Poundstone, III; Anthony R. Dykes; Bradley Mazick; Karen Jurls; Andrew McBride; Neuropsychiatry Associates, P.C.; Chester Jenkins; Medical Money Management, Inc., Defendants.**

Civ. A. No. 92–H–1398–N.

United States District Court, M.D. Alabama, N.D.

March 21, 1994.

**922**

Corley, Moncus & Ward, James S. Ward, Kathryn H. Sumrall and Ezra B. Perry, Jr., Birmingham, AL, for plaintiff.

Rushton, Stakely, Johnston & Garrett, Thomas H. Keene and Fred W. Tyson, Montgomery, AL, for Videon, etc., Jenkins, Neuropsychiatry Assoc., and Medical Money Mngmt.

Carpenter & Gidiere, Philip S. Gidiere, Jr., Montgomery, AL, for Mazick.

G.R. Trawick, State of Ala. Dept. of Mental Health and Mental Retardation, Montgomery, AL, for King, Poundstone, Dykes, Jurls & McBride.

## MEMORANDUM OPINION

HOBBS, District Judge.

Plaintiffs have brought this civil rights action pursuant to 42 U.S.C. § 1983 to redress alleged violations of plaintiffs' constitutional rights. Pendent state claims, grounded in theories of negligence, wantonness, and *respondeat superior*, are also at issue. The court has jurisdiction over plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343, and over the state claims under the doctrine of supplemental jurisdiction.

All defendants have filed motions for summary judgment[1] on the basis of qualified and substantive immunity. The issues having been briefed by the parties, the matter is now before the court. For the reasons set forth below, the court concludes that the motions should be denied as to the federal claims, but granted as to the state claims.

---

**1.** Defendant Medical Money Management, Inc. has not filed a separate motion for summary judgment, but did orally represent to the court that its interests were congruent with those of

## I. FACTUAL BACKGROUND

■ At this stage of the proceedings, the facts, and all reasonable inferences to be drawn from those facts, are construed in the light most favorable to plaintiffs. *Swint v. City of Wadley*, 5 F.3d 1435, 1439 (11th Cir.1993). The following findings, therefore, do not necessarily describe the circumstances with accuracy.

On February 17, 1991, the Baldwin County Juvenile Court ordered David Dolihite to Eufaula Adolescent Center as a result of problems displayed in school and home behavior. At the time of said determination, the child had no juvenile convictions on his record and no history of drug or alcohol abuse.

Upon his arrival at Eufaula Adolescent Center, on January 13, 1992, David age 15, was assessed and evaluated by defendants Dr. Maughon, a psychiatrist, Dr. Mazick, a psychologist, Karen Jurls, a social worker, Andrew McBride, a psychologist, and others. During these assessments, it was reported that David had made prior suicide attempts, gestures, and was known to have frequent suicidal ideations. It was also noted that David's grandmother had committed suicide. (Medical record of David Dolihite of January 22, 1992.) David was also interviewed by Andrew McBride on January 23, 1992. McBride, a psychologist at Eufaula, noted that David had suffered from problems with sleeping, suicidal ideations, and that David had made several suicidal gestures, and experienced homicidal ideations. (Medical records dated January 23, 1992.)

Dr. Maughon noted in his psychiatric evaluation of David that there was an obsession of writing poetry with themes of death. David had threatened suicide in March of 1991 by giving a poem to his former girl friend describing his death. He stated that he felt suicidal when he became angry. (Medical records dated January 23, 1992.) On January 23, 1992, ten days after David's arrival, the Eufaula Adolescent Center master treatment plan was entered into David's record. This master treatment plan was

defendant Drs. Jenkins and Maughon. The court evaluates Medical Money Management's liability in this light.

signed by Dr. Jenkins, a psychiatrist, McBride, Jurls, and others. (Medical Records of David Dolihite.) The treatment plan for these and other problems exhibited by David stated that David was supposed to be involved in a thirty minute individual therapy session once weekly, and one forty-five minute weekly group session. (Medical records of David Dolihite.)

On January 26, 1992, David was placed on continuous observation status because of his suicidal remarks. On February 4, 1992, David injured his left wrist through self-mutilation. On February 4, 1992, it was noted by defendant Jurls that David presents as extremely "irrational" regarding his thought processes. On February 14, 1992, David was assigned to work restriction and two days dorm restriction for "writing on a security screen." What David wrote on that security screen was "Oh God, Oh God, I want to die. Death. Suicide are the facts of life." (Medical records.) No suicide assessment was initiated as a result of this conduct nor was David seen, concerning this incident, by a psychologist or psychiatrist.

On February 15, 1992, David was placed in seclusion for being a "threat" to the community group. David was secluded on many occasions which included seclusion in "Building 112." (Affidavit of John Fowler, and Statement of Allen Forte). This building is located across the compound from the dormitory, and it separates the patient from all the other patients. The patients are put in one of three "cells" located in a narrow corridor. The cell doors are painted black. The cells are approximately nine feet long and six feet wide with a grate over the top of the cells with a light hanging through the steel grate. There is a two by four which goes across the door and is fixed into two U bolts. The building is not heated and the children must sit on a cold concrete floor while in the cell. (Affidavit of John Fowler and Statement of Allen Forte.) On October 31, 1990, Dr. Robert L. Okin, chairman of the Wyatt consultant committee, relayed the concerns of the committee that the use of restraint and seclusion was being inappropriately administered at Eufaula. *See also* PEx. 11, Annual Advocacy Report of Kathy Sawyer; PEx. 5, Wyatt Committee Report.

On February 18, 1992 at 12:40, it was noted in the nursing flow sheet that David was talking to himself. He told the nurse he was "talking to his friend who told him what to do." (Medical records of David Dolihite). On March 2, 1992, it was noted that David continued to enjoy the "shock value" of talking about suicide. On March 3, 1992, David attempted to escape from Eufaula Adolescent Center. For this he was put into "time out" for eight hours.

At 3:00 p.m. on March 8, 1992, David intentionally cut his left arm severely and was sent to the emergency room for sutures. He stated that he was going to kill himself, that he was not going to have sutures put in, and that he would remove them if they were. On this same date, Dr. Jenkins, a consulting psychiatrist, was notified about David's having pulled his sutures out of his arm and his wanting to commit suicide. Dr. Jenkins did not see David, but instead simply ordered medication over the phone. Defendant Jenkins also, again without seeing David, authorized "soft restraints" to be used on him. At 5:10 p.m. on March 8, 1992, defendant Jurls was notified about David's suicide threats and his attempt to remove sutures from his arm. David was thereupon put into restraints. David's acts of cutting himself and pulling out his sutures were determined to be a suicidal gesture. David was never seen either by Dr. Jenkins or by Dr. Maughon as a result of this suicidal gesture; nor was he seen by the clinical psychologist on staff, Dr. Mazick.

On March 15, 1992, David was secluded for failure to follow the rules, bleeding on the walls, and defecating on the floor of the "time out" room. Neither defendant Dr. Jenkins nor defendant Dr. Maughon nor defendant Dr. Mazick saw David even after this extreme behavior.

As of March 17, 1992, David was still on close observation status due to his suicidal acts and self-destructive behavior. On March 18, 1992, David was again taken to Lakeview Community Hospital Emergency Room after sticking a pencil in his arm. At that point in time, Dr. Nixon who had seen

David several times and was responsible for his health care, stated that David MUST be evaluated for antipsychotic medication. (Emphasis in the doctor's original note.)

On March 19, 1992, defendant Dr. Maughon saw David and stated that "this young man has been engaging in self-destructive behavior," and that his difficulty seems to be "behavioral." No medication was prescribed and no further assessment was conducted.

On March 21, 1992, David was again placed in seclusion. At this time it is noted that he was beating and banging his head on the wall and cursing loudly. Defendant Dr. Maughon was notified about David's beating and banging his head on the walls and that he was "cursing and totally out of control." Dr. Maughon did not see David, nor did he ask defendant Mazick to see David.

On March 22, 1992, David was restricted to the time out room. Allen Forte was the mental health worker who placed David in time out. David's time out, according to the records, started at 9:30 a.m. Mr. Forte states on David's time out sheet that David was running in and out of the time out room at 9:30 a.m. (Attachment to Statement of Allen Forte.) At 9:35 a.m., Mr. Forte states that David was "trying to hang himself." At 9:40 a.m., Mr. Forte had David secluded. At the time he was secluded, Forte took David's shirt and belt. Mr. Forte stated that when children are placed in seclusion, mental health workers do not take their shirts unless they are trying to bring bodily harm to themselves. (Page 8, Statement of Forte.) When asked if there was any question in Mr. Forte's mind as to whether David was trying to hang himself, Mr. Forte stated that "Every fifteen minutes we have to do a check. He was in there, and I had to check him every fifteen minutes so I knew who was in there and I knew what was going on." (Statement of Forte.)

John Fowler told Karen Jurls the following day that David had tried to hang himself. (Affidavit of Fowler.) It was also noted on March 23, 1992, in David's progress notes, that he was secluded for threatening to do harm to himself. (Medical records of David Dolihite.) On March 24, 1992, at 10:00 a.m., Ms. Jurls noted that the treatment team had decided that David should serve three days dorm restriction due to his disruptive behavior. This note is directly under the March 23, 1992 note indicating that David had threatened to harm himself on March 22, 1992 and had to be secluded. However, on March 24, 1992, at 1:00 p.m., according to the records, Ms. Jurls allowed David off "close observation." Shortly thereafter there is an entry in his record by defendant Mazick, the first such entry since David's arrival some two months previously. This entry indicates that defendant Mazick told David that "he had not engaged in the self-injurious acts for several days and it was possible he could be taken off close observation." This entry ignored the fact that David had attempted to hang himself on the night of March 22, an act which was documented in the progress report and seclusion note just one day before.

On March 24, 1992, an hour and half after defendant Mazick saw David, David was found hanging in his closet by a shoestring. Emergency CPR was performed and David was resuscitated. He was sent to Children's Hospital in Birmingham where it was determined that he suffered severe hypoxic brain damage. David remains in serious condition presently and currently functions at the level of a three-year-old.

A review of David's records from Eufaula Adolescent Center indicates that during a period of seventy days, David received only three and one-half hours of limited therapy with a social worker and only six hours of group therapy. In that same seventy days, however, David was secluded for a period of fourteen hours, was on dorm restriction for a period of ten days, and was kept in time out for a total of sixty-four hours.

While David was at Eufaula, gangs allegedly harassed, assaulted, abused, and intimidated students, including David. Students allegedly were subjected to an environment of verbal and physical abuse, and were also permitted to listen to satanic, pro-suicidal music. David was abused by both students and staff, a fact to which Jurls, McBride, Mazick, and Dykes were allegedly aware. David more frequently received punishment than treatment while at Eufaula. (Affidavit

of Fowler and Kirby, Statement of Forte and medical records of David Dolihite). In addition, David was only seen by a psychiatrist twice during the seventy days he was in this mental health facility: once when he was given the mandatory psychiatric assessment and again on March 19, 1992, four days before his death. (Medical records of David Dolihite.) According to documentation in David's record, David was seen only twice by the staff psychologist, once upon his assessment of January 23, 1992 and a second time on March 24, 1992, approximately one hour before his death.

The day following David's suicide attempt on March 24, 1992, an investigation was begun into the incident by the Department of Mental Health. According to its investigation report, the attempt David made to hang himself on March 22, 1992 was "not really made by David but was made by another boy, John Fowler." (See statement of Investigation.) According to the Department's investigation report, the mental health worker, Allen Forte, who had carefully and clearly documented the attempt of March 22, 1992, "made a mistake" when he wrote the information down. Mr. Forte has provided sworn testimony indicating that he was told to lie to the investigator by stating that someone other than David Dolihite had attempted to commit suicide on March 22. To quote Mr. Forte's sworn statement:

Q Now, after David tried to hang himself and was injured on March the 24th, did anybody ask you to make an affidavit concerning the events of the night of the 22nd when this sheet was made out?

A I was off this weekend when this happened, when he hanged himself. But when I got back to work, I was told that it wasn't David Dolihite that tried to hang himself that night.

Q On the 22nd?

A Right. I was told that I had made a mistake, and what I had written down on the observation sheet here, that I needed to change because I had made a mistake. And the investigator came down from Montgomery, and I written out an affidavit saying that I had made a mistake.

Q Had you made a mistake?

A No. But there's a lot of things that be swept under the rug, you know, so I written out an affidavit.

Mr. Forte's statement cites episodes of failure to provide medical care, episodes of physical abuse of the patients by the staff, and instances of sexual abuse of the patients by other patients. This sworn statement is corroborated by the affidavits of John Fowler, Billy Kirby, the records of Kathy Sawyer, the patient advocate, the Wyatt Committee reports, the photographs of the conditions in the seclusion room in Building 112, and the medical records of David Dolihite.

## II. *DISCUSSION*

### A. Standard for Summary Judgment

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." A district court must consider "all the evidence in the light most favorable to the non-moving party ... and resolve all reasonable doubts in favor of the non-moving party." *Earley v. Champion International Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990) (citations and internal quotations omitted). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party need make this showing only after the moving party has satisfied its burden. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

### B. Section 1983 Cause of Action

Section 1983 provides a civil remedial vehicle for persons claiming violations of their rights secured by either the Constitution or by federal laws, "broadly encompass[ing] violations of federal as well as constitutional law." *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). Plaintiffs' § 1983 action is grounded upon

allegations that defendants violated the due process component of the Fourteenth Amendment of the Constitution as well as substantive provisions delineated in *Wyatt v. Stickney,* 344 F.Supp. 373 (M.D.Ala.1972), *aff'd in part, reserved in part, Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir.1974).

■ All defendants maintain that their actions violated no constitutional requirement, and that qualified immunity protects them from this lawsuit in their individual capacities. In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 100 S.Ct. at 2738. Because a "reasonably competent public official should know the law governing his conduct," *id.* at 818–19, 100 S.Ct. at 2738, the existence of clearly established law will defeat the immunity defense. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), explained that qualified immunity is a fact-sensitive inquiry, such that the "contours of the right [at issue] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. at 3039. As previously noted, the facts must be analyzed in the light most favorable to the plaintiff. *Howell v. Evans,* 922 F.2d 712, 718 (11th Cir.1991).

■ *Harlow's* objective reasonableness test is applied through a two-part analysis:

(1) The defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."

(2) Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional law."

*Rich v. Dollar,* 841 F.2d 1558, 1563–64 (11th Cir.1988) (quoting *Zeigler v. Jackson,* 716 F.2d 847, 849 (11th Cir.1983)). Defendants have easily met their burden of demonstrating that they were acting within their discretionary authority. Because defendants deny that they violated any of David Dolihite's clearly established rights, the burden now shifts to plaintiffs to show that the legal norms allegedly violated by defendants were clearly established at the time in question, as well as to marshal "evidence sufficient to create a genuine issue of fact as to whether the defendant engaged in conduct violative of the rights guaranteed by clearly established law." *Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1503 (11th Cir.1990); *Hutton v. Strickland,* 919 F.2d 1531, 1537 (11th Cir.1990). The bulk of this opinion is devoted to determining whether plaintiffs have met their burden.

■ It is well settled that state governments possess "a constitutional obligation to provide minimally adequate medical care to those to whom they are punishing by incarceration." *Harris v. Thigpen,* 941 F.2d 1495, 1504 (11th Cir.1991) (citing *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)). If minimally adequate medical care is not provided, a plaintiff establishes an Eighth Amendment violation by proving that a defendant was "deliberately indifferent" to the plaintiff's serious medical needs. The Supreme Court has determined that persons who are subjected to involuntary civil commitment are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo,* 457 U.S. 307, 322, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982).

■ The Court in *Romeo* made it clear that the Fourteenth Amendment due process requirements imposed on state officials who are entrusted to care for those who have been civilly committed to state institutions are considerably more rigorous than those imposed under the Eighth Amendment which are applicable to prisoners. *Romeo* announced that liability may be imposed under the due process clause when a "decision by [a] professional is such a substantial depar-

ture from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Romeo*, 457 U.S. at 307, 102 S.Ct. at 2454. Although it is difficult to discern the degree to which this standard exceeds the requirements of the deliberate indifference standard,[2] and although it is clear that the professional judgment standard is the applicable one, the court concludes that all defendants have failed to demonstrate the absence of a factual issue concerning his or her compliance with either standard.

▆▆▆ Despite the fact that all defendants disclaim any responsibility for David's attempted suicide, which led to his grievous injuries, in numerous cases courts have held that the law is settled that a constitutional violation occurs if jailers, with no training whatsoever in psychological evaluation, fail to take reasonable precautions to prevent suicides when put on notice of the suicidal tendencies of an inmate. *See, e.g., Tittle v. Jefferson County Comm'n*, 10 F.3d 1535, 1539–40 (11th Cir.1994) (en banc) (stating that individual officials with notice of an individual's suicidal tendencies are potentially liable for their deliberate indifference); *Greason v. Kemp*, 891 F.2d 829, 835–36 (11th Cir.1990) (collecting cases); *Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir.1989) (failure of prison staff member, who was not a psychiatrist, to notify competent officials of inmate's dangerous psychiatric state, may constitute a § 1983 violation). In David's case, a person with *known*, documented suicidal tendencies was placed in an institution charged with treating that person's psychological problems. The law is at least as settled that persons trained to care for emotionally disturbed youths are also liable if put on notice of suicidal tendencies and they fail to take reasonable precautions to prevent

suicide. *See, e.g. Greason v. Kemp*, 891 F.2d at 835.

The court, nonetheless, notes the difficulty it has encountered in attempting to divine the present commands of qualified immunity doctrine. Qualified immunity purports to insure that government officials are held personally liable only for violations of clearly established law. In part, the doctrine is designed to reassure government officials that a chosen course of conduct will not subject them to liability unless it is clear that the conduct is illegal. (Paradoxically, the determination of whether a particular defendant's actions violate clearly established law has become one of the more opaque and difficult tasks to besiege trial courts in recent years.)

Despite insisting upon a standard of absolute clarity to guide public officials, appellate courts have created a nebulous, increasingly cryptic standard to guide trial judges. This indeterminacy spawns litigation despite a stated objective of the qualified immunity defense of avoiding the expense and harassment of litigation. Perhaps the indeterminacy is inevitable, particularly in the field of mental health, where the fact-sensitive nature of qualified immunity is heightened. Each case seems to present a voyage into unchartered and dubiously navigable legal waters. This court, with trepidation, commences that voyage.

1. Liability of Defendants Maughon, Jenkins and Medical Money Management, Inc.

Doctors Maughon and Jenkins were employees of Medical Money Management, Inc., an entity which contracted with the Alabama Department of Mental Health and Mental Retardation to "[p]rovide psychiatric services to [Eufaula Adolescent Center] on a consult-

---

2. *See, e.g., Yvonne L. v. New Mexico Dept. of Human Resources*, 959 F.2d 883, 892–94 (10th Cir.1992) (confessing its inability to articulate the difference between the deliberate indifference and professional judgment standards).

The Third Circuit may have come closest to successfully grappling with the distinction between the standards. In *Shaw By Strain v. Strackhouse*, 920 F.2d 1135 (3rd Cir.1990), the court suggested that the professional judgment standard

roughly approximated a recklessness or gross negligence standard. The court stated that "[p]rofessional judgment, like recklessness and gross negligence, generally falls somewhere between simple negligence and intentional misconduct." *Id.* at 1146. The point may be academic; defendants in the present case have not removed as a fact issue whether they acted with deliberate indifference, much less whether they exercised professional judgment.

ing basis." Doctors Maughon and Jenkins state, and the EAC agrees, that they exercised professional judgment and fully complied with the terms of their contract. Nonetheless, plaintiffs' expert Dr. Halpern, a psychiatrist, states that while defendant doctors were acting pursuant to their contractual obligations, with respect to David Dolihite the doctors deviated from professional norms to such an extent that they cannot be said to have exercised their professional judgment. The court must determine whether qualified immunity shields the doctors from liability at the summary judgment stage.

■ Contrary to plaintiffs' contentions, the court determines that the Constitution of the United States was not violated by the doctors if the doctors fully performed their obligations under their contract so long as they did so through the exercise of their professional judgment. In fact, within the duties imposed by the terms of the contract, the Constitution did require the doctors to exercise their professional judgment. The contract bound the doctors to provide the following "consultative services": "admit residents to the facility; provide psychiatric evaluations and determine admitting diagnosis; write initial Treatment Plans and approve all master Treatment Plans and modifications to the treatment plans; prescribe medications, perform medication reviews, and issue PRN orders; conduct mental status examinations and give final diagnosis on all residents who are being discharged; provide expert testimony in court on an as needed basis; consult with facility clinical staff on an as needed basis; provide call coverage 24 hours per day." The contract also stated that defendants were "responsible for providing the necessary time to render the above services in a professional manner."

Disposition of the claims against the doctors is governed by a series of Eleventh Circuit cases directly confronting the manner by which the quality of a doctor's treatment is to be evaluated according to professional standards. *See Howell v. Evans,* 922 F.2d 712 (11th Cir.), *vacated as moot,* 931 F.2d 711 (1991), *reinstated* by unpublished order, *sub. nom Howell v. Burden,* 12 F.3d 190, at asterisk-footnote (11th Cir.1994) (corrected

opinion); *Greason v. Kemp,* 891 F.2d 829, 835–36 (11th Cir.1990); *Waldrop v. Evans,* 871 F.2d 1030 (11th Cir.1989); *Rogers v. Evans,* 792 F.2d 1052 (11th Cir.1986). Most recently in *Howell v. Evans,* while applying the Eighth Amendment standard, the court reiterated that "because the mere negligent diagnosis or treatment of a patient does not constitute deliberate indifference, [t]he law must ... be clear and specific enough for the medical official to know that his [or her] actions rise to the level of deliberate indifference and are not just negligent." *Howell v. Evans,* 922 F.2d at 719 (citation omitted). Moreover, medical treatment cases are unique, for the standard that must be clearly established need not depend solely on legal precedent. The court stated that "the contemporary standards and opinions of the medical profession also are highly relevant in determining what constitutes deliberate indifference to medical care." *Id.; see Greason v. Kemp,* 891 F.2d 829, 835 (11th Cir. 1990); *Rogers,* 792 F.2d at 1058.

■ Thus, two avenues exist by which a plaintiff may demonstrate deliberate indifference or the absence of medical judgment: a plaintiff may show that the facts are similar to prior cases where a § 1983 violation was found, or a plaintiff could, and perhaps must, "produce opinions of medical experts which assert that the official's actions were so grossly contrary to accepted medical practices as to amount to deliberate indifference." *Howell v. Evans,* 922 F.2d at 719–20. Regarding the first method of showing deliberate indifference, the court noted that the standard "focuses on the failure to provide or allow proper treatment in the face of information which reasonably should compel action." *Id.* at 720.

The court further explained the parameters of the first method of proving deliberate indifference by stating that such "indifference is often manifest by a refusal to act when certain actions were or should have been known to be necessary, rather than simply a failure to act. In some cases, however, if an official knows or should know that certain treatment is necessary, and he delays in providing such treatment when he reasonably should know that such delay can be

hazardous, his actions could constitute deliberate indifference." *Id.* at 720. With regard to the second avenue the court found, "relevant to the actions of a medical official, if the plaintiff demonstrates that a reasonable doctor in the defendant's position would have known that his actions were grossly incompetent by medical standards, then a jury could find deliberate indifference and qualified immunity would be inappropriate." *Id.*

██ In the present case, the psychiatrists' actions theoretically depended upon medical judgments; thus plaintiffs must do more than appeal to prior cases to demonstrate that the law is clearly established. *Id.* at 720. The affidavit of Dr. Abraham L. Halpern, a psychiatrist, serves this function. In the affidavit, Halpern notes that the doctors were members of David's treatment team, and therefore knew, or should have known,[3] of the increasing episodes of self-mutilation, disruptive behavior, mood swings, psychotic episodes, and suicide threats and attempts that occurred over a 70–day period.[4] If as Dr. Halpern has stated, the doctors knew or should have known of these documented problems of David, failing to act appropriately could constitute the absence of the exercise of professional judgment. Dr. Halpern has so expressed his expert opinion in his affidavit.

Dr. Halpern stated that the doctors "made no attempt to properly evaluate and treat David" for his mental disorders. Affidavit #2 at p. 3. Given the information in the doctors possession, Dr. Halpern states that the doctors "should have prescribed antidepressant medication for this child" and should have monitored the child's response to this medication. *Id.* Because only the psychiatrists could prescribe medication, defendants Jenkins and Maughon could not possibly believe that this duty was not encompassed by the terms of their contract. In addition, Halpern states that the doctors

should have directed that David "receive intense and lengthy individual therapy." *Id.*

Dr. Halpern states that even after several instances of David's exhibiting severe mental disturbance, the doctors performed no testing or in-depth evaluation of David's condition. Halpern states that Defendant Maughon's conclusion—formed after David's March 15 seclusion for bleeding on the walls and defecating on the floor—that David's problems were behavioral could not have been based on any degree of professional judgment. Halpern states that there was "no effort on the part of Dr. Maughon to perform any tests of standard psychiatric evaluation of David." *Id.* at p. 4. Halpern characterizes Maughon's efforts at evaluation as a "total departure from the professional judgment and standard which should have been followed." *Id.*

Similarly, both Drs. Maughon and Jenkins ignored the report indicating that on March 21st David was placed in seclusion for his self-directed violent behavior. Not only did the doctors fail to see David after this report was received by Dr. Jenkins, but they also failed to ask the Ph.D. psychologist to see David. *Id.* at 5. Dr. Halpern, then, alleges more than that the professional opinions of defendants Maughon and Jenkins were inadequate; he alleges that they failed to formulate and act upon any professional opinion at all.

The primary findings of Dr. Halpern are as follows:

1. Dr. Jenkins' and Dr. Maughon's treatment of this child was such a total departure from accepted professional judgment, practice or standards, that it cannot be said that their treatment was based on accepted professional judgment or psychiatric practice in the general community.

2. As a result of the departure from accepted professional judgment on the part of the psychiatrists and on the part of the

---

3. If a doctor fails to know something the doctor should have known, the doctor may be found to violate the constitutional standard. *See, e.g.,* *Waldrop,* 871 F.2d at 1036.

4. Defendant McBride stated that he informed the entire treatment team, including Dr. Maughon

and eventually Dr. Jenkins, that David harbored suicidal ideations before coming to Eufaula. McBride depo. at 9–11. Both doctors were apprised of David's suicidal ideations and gestures. *Id.*

staff at Eufaula Adolescent Center, including Dr. Mazick, Dr. Jenkins, Dr. Maughon, Karen Jurls, and Andrew McBride, David was not given necessary and essential individual treatment to afford him a realistic opportunity to be cured or to improve his mental condition.

3. That the lack of treatment by Dr. Jenkins and Dr. Maughon demonstrated deliberate indifference to the serious medical needs of this child.

4. That as a result of this lack of treatment combined with the abuse, neglect, intimidation and fear for his personal security to which David was subjected, David's condition deteriorated significantly while he was a patient at Eufaula Adolescent Center.

5. That within a reasonable degree of medical probability, had David received the necessary and essential treatment from the staff and psychiatrists and had he not been subjected to the atmosphere of abuse, neglect, and intimidation at Eufaula Adolescent Center, David's condition would not have deteriorated in the manner that it did and his ultimate suicide attempt would not have occurred when it occurred.

6. That it was a combination of the above factors, i.e., the lack of treatment on the part of the psychiatrists, the lack of treatment on the part of the staff and the intimidating[,] abusive[,] and insecure conditions at Eufaula, which ultimately caused the deteriorating condition of David's mental health and his ultimate suicide attempt for which he is so devastatingly injured.

The doctors, in defense, rely on the terms of the contract which provide that Drs. Maughon and Jenkins are employed on a "consulting basis." The doctors claim this provision indicates that their duties were not triggered unless they were requested by the personnel of Eufaula. Nonetheless, the doctors acknowledge that they had authority to intervene at any time to direct the treatment of patients. The doctors also acknowledge that they were part of the "treatment team." The procedure for governing treatment team meetings states: "The Treatment Team will meet as often as necessary with *special meetings called at the request of a member of the team.*" PEx. 20, "Treatment Teams" (emphasis supplied). Given this broad authority, Dr. Halpern states that the failure to exercise the authority reveals an absence of medical judgment.

In addition, the "Professional Services Plan for Eufaula Adolescent Center," which outlines the admissions criteria for the center, plainly states that the "currently *actively* suicidal adolescent is not appropriate for initial placement at Eufaula. Such an individual, for that period, requires the security of hospital ward placement until stabilized. Once so stabilized, however, such adolescents are likely to be excellent candidates for the program." (emphasis in original). Defendant McBride stated that a child who expresses the thought and intent to commit suicide is "actively suicidal." McBride depo. at 43.

Every member of David's treatment team possessed information sufficient to indicate that at the time of admission, throughout his stay at Eufaula, David was actively suicidal. *See id.* at 8–9; Fletcher Hamilton's affidavit. Yet none of the members of the treatment team attempted to have David transferred to a more suitable facility. Every member of the team possessed the authority to at least recommend that David be transferred. *See* Jurls depo. at 118–122. That each one failed to act, including both doctors, could indicate a failure to exercise professional judgment. Because there is expert testimony that Drs. Maughon and Jenkins exhibited deliberate indifference or an absence of medical judgment in their treatment of David, the motion for summary judgment of Drs. Maughon and Jenkins, and Medical Money Management[5]

5. Assuming that a corporation, no less than an individual, may invoke the qualified immunity defense, *DeVargas v. Mason & Hanger–Silas Mason Co., Inc.,* 844 F.2d 714, 723 (10th Cir.1988); *Jones v. Preuit & Mauldin,* 808 F.2d 1435, 1440–42 (11th Cir.1987) (private partnership may invoke qualified immunity defense), *vacated in part on other grounds,* 822 F.2d 998 (11th Cir.1987), *opinion vacated and rehearing granted en banc,* 833 F.2d 1436 (11th Cir.1987), *upon rehearing,* 851 F.2d 1321 (11th Cir.1988) (en banc), *vacated on other grounds,* 489 U.S. 1002, 109 S.Ct. 1105, 103 L.Ed.2d 170 (1989), and assuming that a corporation can not be held liable for a § 1983

on the ground of qualified immunity is denied.

## 2. Defendant Karen Jurls

■ Karen Jurls, a professional social worker, was David's primary therapist, and like Jenkins and Maughon, Jurls approved David's treatment plan and served on his treatment team. Similar to the psychiatrists, Jurls is properly characterized as the functional equivalent of a medical official, subject to the strictures of *Howell v. Evans*, 922 F.2d 712 (11th Cir.1991).

■ As a member of the treatment team, Jurls was privy to the admittance information on David Dolihite. She knew of his suicidal ideations and of the family history of suicide. According to the affidavit of Alan Isaacson, a clinical social worker, Jurls failed to meet the most basic standards for rapid evaluation and treatment of individuals who are admitted for treatment of mental disorders. Jurls knew that David was actively suicidal, and according to Eufaula's regulations, Jurls knew that David should not have been admitted and should be transferred. *See Greason*, 891 F.2d at 833, 835–36 (suggesting that a defendant's liability could hinge upon failure to seek transfer of a suicidal person to an adequate facility).

On at least two occasions, despite her knowledge of David's need for intense therapy, Jurls failed to appear for David's individual therapy sessions because of time constraints. (*See* Medical Records). Jurls allegedly used time out and restraint methods as punishment rather than as therapy. Jurls allegedly also knew that abuse was being inflicted on students and acted indifferently toward ending it. Not only did Jurls reportedly engage in abusive behavior herself, but there is evidence that she was motivated by a punishment driven philosophy rather than a therapy driven one. *See* Dykes depo. at 100; Mazick's letter of 3/17/1992. On March 17, 1992, Mazick officially reprimanded Jurls for

violation under a theory of *respondeat superior, Sanders v. Sears & Roebuck & Co.,* 984 F.2d 972 (8th Cir.1993); *Rojas v. Alexander's Dept. Store,* 924 F.2d 406 (2d Cir.1990), the court nonetheless concludes that Medical Money Management's motion for summary judgment is due to be denied.

her inability to conform to a therapeutic regimen, as well as for her own demonstration of verbal abuse toward a patient. PEx. 15.[6]

Furthermore, Jurls denies that on March 24, 1992, she knew that David had attempted suicide by hanging on March 22. The record clearly revealed that seclusion had been employed to stop David from hanging himself. Had she known about this, she would have abdicated all professional judgment by allowing David off "close observation." Yet, she did release David from "close observation," and this indifference could well be viewed as proximately causing David's death.

Jurls denies seeing the documentation of the March 22, 1992 attempted suicide. Yet she did know about a suicide pact involving David. Both David and John Fowler told Jurls that David had tried to kill himself. Jurls denies that the entry was accurately made, and disputes the affidavit of Allen Forte which alleges David was indeed the potential suicide victim. Although Jurls alleges that Dykes told her an error was made in the chart, and that some other resident actually tried to hang himself, she does not know who that child was, nor did she inquire as to who that child was. Jurls Depo. at 161–65. A jury is entitled to disbelieve this testimony which is particularly curious in that the central social worker was not interested in who had *actually* attempted suicide. Jurls' credibility being at stake, the issue is a triable one.

Jurls' story is not unlike that of the defendant in *Howell v. Burden*, 12 F.3d 190 (11th Cir.1994). In *Burden*, the defendant claimed he had not read a specific document that would have informed him of plaintiff's serious medical needs. The court held that the jury was entitled to disbelieve Burden, and to find that he had indeed read the document in question. *Id.* at 193. Similarly, a jury may determine that Jurls read the report of Allen Forte, that she knew that David was suicidal,

6. Jurls' antipathy toward Mazick indicates that her approach to treating the residents was not aligned with their therapeutic interests.

and that she acted with deliberate indifference to that knowledge. As the court stated in *Greason v. Kemp*, 891 F.2d 829 (11th Cir.1990), "Where ... personnel directly responsible for [resident] care have knowledge that a [resident] has attempted, or even threatened, suicide, their failure to take steps to prevent that [resident] from committing suicide can amount to deliberate indifference." *Id.* at 835–36.

3. Defendant Mazick

 Dr. Mazick was the clinical director at EAC and was a policy-making administrator. According to Mazick, "I had the responsibility ... to create the clinical environments" that would ensure that children at Eufaula were not physically or mentally abused or neglected. Mazick depo. at 83. He supervised the activities of Maughon, Jenkins, Jurls, and McBride, and was responsible for making sure David was properly evaluated and treated. *Id.* at 119, 127–28. Mazick, as a licensed psychologist, was qualified to diagnose mental illness. Thus, the determination of his eligibility for immunity is also governed by the *Howell v. Evans*, 922 F.2d 712 (11th Cir.1991), standard governing medical professionals.

 After David arrived at EAC, he remained there for ten days before receiving any therapy or receiving any form of psychiatric or psychological assessment. After the assessment, Mazick recognized that David suffered from suicidal ideations, had a family history of suicide, and made suicidal gestures and attempts. Nonetheless, in violation of EAC policy, Mazick made no attempt to have this "actively suicidal" child transferred to another facility.

Dr. Mazick rarely communicated with, and allegedly wholly neglected to supervise, the social worker Karen Jurls. Dr. Mazick failed to review David's clinical course on a regular basis and failed to monitor his condition and response to treatment by Jurls. Indeed, although Dr. Mazick's responsibility was to supervise therapeutic care, he never reviewed David's chart until one hour before David hanged himself. Not only did Dr. Mazick fail to diagnose David, but he also failed to insure that one of the psychiatrists

was consulted about David in light of David's continuing suicidal threats and self-destructive acts. In the expert opinion of Fletcher Hamilton, a psychologist licensed in the State of Alabama, such conduct can only be characterized as a refusal to exercise professional judgment. A jury will have to evaluate the competing expert contentions.

 For Mazick to be liable in his supervisory capacity, his conduct must be found to violate *Greason v. Kemp*, 891 F.2d 829 (11th Cir.1990), three-prong test: "(1) whether, in failing adequately to train and supervise subordinates, he was deliberately indifferent to a [resident's] mental health care needs; (2) whether a reasonable person in the supervisor's position would know that his failure to train and supervise reflected deliberate indifference; and (3) whether his conduct was causally related to the constitutional infringement by his subordinate." *Id.* at 836–37. A jury could conclude that Mazick's conduct, evaluated in light of the three-prong test, renders him liable in his supervisory capacity.

Mazick's conduct, moreover, was not unlike the conduct analyzed in *George v. McIntosh–Wilson*, 582 So.2d 1058 (Ala.1991). In *George*, the administrator of a mental health institution who formulated policies and procedures, including individual rehabilitation plans, and who was responsible for assuring compliance with formulated policies, was found to be potentially liable on the basis that the defendant failed to assure that there was "ongoing communication between the administration, psychiatric staff, and direct care staff." *Id.* at 1063. Likewise, Hamilton faulted Mazick because there was "no evidence of communication or clinical supervision between Jurls and Dr. Mazick concerning David's clinical treatment." This absence of communication extended to Mazick's failure to properly communicate with the two psychiatrists.

Consequently, Mazick could also be liable for "not taking reasonable steps to train" the employees. *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). Although Mazick's responsibility included ensuring that the staff

at Eufaula was adequately trained, Mazick depo. at 210, David was seen by neither a psychologist nor psychiatrist for nearly two months. Indeed, during the seventy days David resided at Eufaula, he received only three and one-half hours of individual therapy with a social worker and only six hours of group therapy. Besides his initial evaluation, David was seen only once by a psychiatrist. Whether this dearth of treatment was "a matter of gross incompetence, negligence, or medical judgment is disputed and a proper subject of expert testimony." *Rogers v. Evans,* 792 F.2d 1052, 1062 (11th Cir.1986).

### 4. Liability of Andrew McBride

 McBride, a psychologist at Eufaula on the date the incident occurred, conducted a psychological assessment in order that David be admitted to Eufaula. He has been a psychologist at Eufaula since 1987, and was a member of David's treatment team. When David first arrived at Eufaula, McBride did an initial intake, interviewed David, and reviewed his psychological evaluations. McBride knew David was suicidal when he arrived at the center. McBride depo. at 7–9. Being part of the treatment team that met every week, McBride knew of David's suicidal ideations, of the seclusions, dorm restrictions, and time outs. McBride knew about the conditions in Building 112, and was aware of David's injuring himself and threatening suicide.

McBride saw David on Monday morning after the initial attempt to hang himself. McBride did not perform a suicide assessment on David at that time, despite his awareness of Mr. Forte's report, McBride depo. at 28–32, and despite his knowledge that David had been secluded over the weekend, had been in time out prior to seclusion, and had attempted to injure himself while in the time out room. McBride depo. at 34, 35, 36. Even if one believes that McBride failed to review the time out sheet describing David's self-injurious behavior, McBride could be considered to have abdicated his responsibility to exercise professional judgment. After this episode, McBride did not engage David in any individual therapy. According to the expert affidavits of Fletcher Hamilton and Alan Isaacson, a licensed clinical social worker, McBride's conduct did not comport with the exercise of professional judgment.

McBride knew that there were gangs at Eufaula. *Id.* at 55. He knew that there had been incidents of abuse. He stated that he was unsure whether such an environment could aggravate David's condition. McBride knew that a child who expressed the thought and intent to commit suicide was an actively suicidal child. He knew that David fit this description. He also knew that Eufaula's own policy forbade the retention of an actively suicidal child. *See supra* part B.1. Nonetheless, he did not consider transferring David to another facility. McBride's failure to recommend transfer could be considered an abdication of professional judgment. *See Greason,* 891 F.2d at 833, 835–36 (suggesting that a defendant's liability could hinge upon failure to seek transfer of a suicidal person to an adequate facility).

Whether professional judgment was in fact exercised requires a consideration of factors that cannot be evaluated in the absence of a fully developed factual record. The affidavits presented by plaintiffs pose a clear factual dispute. McBride, along with each of the above defendants, possessed sufficient personal knowledge of David Dolihite's case to expose himself to Section 1983 liability. A different line of inquiry is required to determine whether the link between the alleged violations of David Dolihite's constitutional rights and the other defendants' activity exists.

### C. Section 1983 Supervisory Liability

 To determine the extent to which defendants Dykes, Poundstone, and King may be liable, one must consider the parameters of supervisory liability. Liability may not be premised on a theory of *respondeat superior. Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). Instead, liability arises when plaintiffs are capable of demonstrating a link between the supervisory defendant's behavior and the deprivation of David's constitutional rights. Although *Greason v. Kemp,* 891 F.2d 829 (11th Cir.

1990), delineates and applies the Eleventh Circuit standard of supervisory liability, see *supra* part B.3., this court supplements its analysis with reference to *George v. McIntosh–Wilson,* 582 So.2d 1058 (Ala.1991), a similar case applying the professional judgment standard in the context of supervisory liability.

In *George v. McIntosh–Wilson,* 582 So.2d 1058 (Ala.1991), the Alabama Supreme Court examined the breadth of § 1983 liability as it related to administrators of a mental health care facility. *George* stated that supervisory liability would attach "where the policies of the [h]ospital as formulated or applied result in such a lack of training and supervision as to constitute deliberate indifference to clearly established constitutional rights to a reasonably safe environment. Such indifference constitutes a 'personal involvement' in the alleged violation." *See also McLaughlin v. City of LaGrange,* 662 F.2d 1385, 1388 (11th Cir.1981) (per curiam) (requiring personal involvement, or evidence of policy or custom, in order to find supervisory liability). The court added that "policy-making administrators would be liable for the constitutional deprivations caused by their subordinates if they exhibited such a degree of indifference to compliance with ... policies as to demonstrate that they did not base their actual administrative decisions or actions on the professional judgments embodied in the policy." *George,* 582 So.2d at 1063.

In the present case, the policies requiring enforcement include not only those that defendants actually attempted to implement, but those that arise out of the landmark case of *Wyatt v. Stickney,* 344 F.Supp. 373 (M.D.Ala.1972) (Johnson, J.) (standards for the mentally ill), *aff'd in relevant part sub. nom. Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir.1979), and its progeny. In the 1972 decision, Judge Johnson ordered the Department of Mental Health and Mental Retardation to bring its facilities in compliance with certain minimum constitutional standards (the *Wyatt* standards). The *Wyatt* standards promul-

gated by the court have been the source of litigation for over two decades.

On February 28, 1975, this court determined that the *Wyatt* standards be extended to cover the Eufaula Adolescent Center "at least insofar as these standards have relevance to [the Eufaula] facilities." The court further indicated that the staffing ratios specified in the 1972 *Wyatt* order applied in a generalized sense to Eufaula, but that the Eufaula ratio did not have to mirror the specified ratio.

The *Wyatt* litigation continued throughout the 1970s, culminating in the court's finding that gross constitutional deficiencies remained and that the governor should be appointed as receiver of the state system.[7] Under the compliance plan approved by the court, the defendants were to achieve compliance with all but a few of the *Wyatt* standards within eighteen months. In 1981, the plaintiffs returned to court to ensure that the defendants had complied with the plan. The defendants, in turn, sought to modify the 1972 order by eliminating the standards and substituting in their place a requirement that defendants obtain accreditation of the state's mental illness facilities by the Joint Commission on the Accreditation of Healthcare Organizations (JCAH or JCAHO) and certification of the mental retardation facilities through Title XIX of the Social Security Act. The defendants contended that the *Wyatt* standards exceeded minimum constitutional requirements.

In 1986, the parties submitted to the court a proposed consent decree intended to resolve the outstanding disputes. The court approved the proposed decree on September 22, 1986. *See Wyatt v. Wallis,* 1986 WL 69194, (M.D.Ala. 9/22/86). The decree contained several provisions of particular significance to this litigation. First, all parties agreed in the decree that all prior orders and standards issued by the court regarding the obligations of the state system, including the original *Wyatt* standards, were to remain in force and that the defendants would "continue to make substantial progress in achieving

---

7. The following is a skeletal outline of the pertinent events in the *Wyatt* litigation. For a more detailed account, from which this version has been condensed, see *Wyatt, By and Through Rawlins v. King,* 811 F.Supp. 1533 (M.D.Ala.1993) (Thompson, J.); PEx. 13.

compliance" with these orders and standards. Decree of 9/22/1986 at ¶¶ 6, 7. Second, defendants agreed "to continue to make substantial progress in placing members of the plaintiff class in community facilities and programs." *Id.* at ¶ 9. Additionally, the 1986 decree required the DMHMR to: (1) make substantial progress in placing members of the plaintiff class in community facilities and programs; (2) make all reasonable efforts to achieve full accreditation of Alabama's mental health facilities by the Joint Commission and Accreditation of Hospitals and to maintain such accreditation; (3) to develop and implement an internal advocacy program and a quality assurance program.

On January 18, 1991, at least five years after adoption of the consent decree, the defendants moved the court for a finding that they had met their obligations under the decree and for an order terminating the lawsuit. In response to this motion, the court appointed an expert to investigate the factual issues relating to defendants' compliance. *See Wyatt, By and Through Rawlins v. King,* 803 F.Supp. 377, 381 (M.D.Ala.1992). Judge Thompson has, to date, declined to terminate the lawsuit.

During the course of this protracted litigation, the *Wyatt* Consultant Committee has investigated the treatment practices of the DMHMR and has offered numerous criticisms and suggestions. Their reports indicate that the promise of adequate treatment has yet to be fulfilled and that grave deficiencies remain in the treatment that is offered. On March 19, 1991, the Committee, which was created to provide independent consultation to the defendants as well as to inform plaintiffs of defendant's progress or lack thereof, submitted a report which reviewed the deficiencies in depth. PEx. 5. The March 19, 1991 report specifically addresses problems at Eufaula. The report states that Eufaula is not accredited by JCAH, but is instead accredited by an organization with very few guidelines applicable to a children's residential facility. The current accrediting entity has no specific standards dealing with restraint or seclusion, practices widely used at Eufaula. The Committee explicitly stated that this accreditation was an *inadequate*

substitute for JCAH accreditation. In addition, the Committee reported the following:

1. Gross inadequacies existed in the charts, specifically in histories, the psychiatric examinations, the overall clinical assessments, and the treatment planning. In a number of charts randomly selected there was no history or clinical assessment at all, the psychiatric examination was totally inadequate, and the treatment plans were "canned" and lacked any individualization.

2. Review of the ongoing treatment revealed that the foregoing problems were not confined to documentation, but reflected deeper problems in the facility and in the staff's clinical understanding of the children. We were struck by the lack of sensitivity on the part of the treatment staff to the painful wounds that these children were struggling with.

3. There was a lack of ongoing therapy in other parts of the mental health system for the families of Eufaula, and a lack of ongoing contact between the community mental health agencies and Eufaula—despite the fact that many of these children will be discharged right back to the troubled families from which they came in the first place.

The Committee also stated:

The above problems, though deeply disturbing, are in fact not as fundamental as another one: that most of these children probably don't belong at Eufaula in the first place. Judges send them there in large part because there are no alternatives. It was the conclusion of the Committee, shared by at least two senior members of the Department, that the vast majority of the Eufaula children needed different kinds of services than they were getting:

(a) a spectrum of community residential settings that for the most part could be unlocked, with high quality clinical treatment, and with an emphasis on treating the families as well as the children when this was clinically indicated; and

(b) a small, locked facility for those children who, for some period of time, cannot be treated in an open setting.

Whether open or locked, all of these settings should be located in areas that are not geographically isolated so that (1) families can visit and be involved in the treatment process when this is clinically indicated; (2) staff who are involved in treating the children can interact with staff who are treating the families; (3) the children can be kept in the school system when this is realistic and practical; and (4) high quality staff can be recruited more easily than is the case in a remote facility like Eufaula.

The report identified a number of steps the DMHMR needed to take to address the problems. *See* Committee Report, PEx.5. The report also noted that defendant Poundstone "agreed to conduct a two-month study of the use of restraints and seclusion at Eufaula, and in particular the use of 'hard' restraints." PEx. 5., at p. 8.

The above report is representative of those received by defendants. The degree to which defendants have complied with this court's orders is appropriately determined by reference to such criticisms and the response such criticisms evoked. Most importantly, however, the continuing deficiencies reflect a non-compliance with the *Wyatt* standards. In the case at bar, the failure to comply with the spirit and letter of *Wyatt* allegedly created an anti-therapeutic environment which was a proximate cause of David's injuries.

### 1. *Liability of Anthony Dykes*

█ Anthony Dykes was the director of Eufaula Adolescent Center in January 1992; his responsibilities were "to manage and budget, to allocate resources, to do short and long-term planning for the facility, to maintain a positive image with the community non-referral resources." Dykes depo. at 9–10. Although he possessed no formal clinical training, he could overrule any decision that Dr. Mazick made. Mazick depo. at 80. He was aware of the *Wyatt* standards, the failure of Eufaula to meet many of them, and moreover, (along with Poundstone and King), is charged with taking no steps to insure that JCAH accreditation was obtained.

The JCAH process works to "assure that the [mental health] facility itself is structured so that decisions will be professionally made." *Woe v. Cuomo,* 729 F.2d 96, 106 (2d Cir.1984). The introduction of JCAH criteria to an institution increases the "likelihood that professional judgments will govern individual treatment decisions within the institution. [After all] JCAH standards address the existence, quality, and specificity of patient treatment plans." *Id.* at 106. Thus, the alleged failure even to seek JCAH accreditation, in the face of a court ordered mandate to do so, not only indicates a violation of clearly established law that plaintiffs contend has led to serious inadequacies in treatment, but it is evidence of an unwillingness to take the steps necessary to ensure that the Eufaula staff will be able to exercise the professional judgment that *Romeo* requires. As one court has aptly stated: "[The] [l]ack of personnel capable of exercising professional judgment ... itself represents a failure to provide constitutionally safe conditions." *Society for Good Will to Retarded Children v. Cuomo,* 572 F.Supp. 1300, 1345 (E.D.N.Y.1983).

The Second Circuit has determined that the absence of JCAH accreditation deprives a mental health facility and its supervisors of being able to make even a prima facie showing of adequate care. *Woe,* 729 F.2d at 107. Indeed, the Report of the *Wyatt* Committee indicates several shortcomings which epitomize an absence of professional judgment. The consultants reported that treatment plans were "canned" and not tailored to individual needs. The chairman of the *Wyatt* Committee, Dr. Okin, wrote to then Commissioner Horsley, on May 14, 1990, that patients' charts often contained no clinical assessment or history, and that the psychiatric examination was wholly inadequate. PEx. 7. In light of these criticisms, Judge Thompson wrote to Commissioner Horsley on March 22, 1990, that the Department of Mental Health should develop "by no later than mid-August 1990, a detailed plan providing both a conceptual framework for children's mental health services and an operational plan to develop needed community based services." PEx. 8. Despite the purported policy of DMH to seek JCAH accreditation, *see* Pltf # 10, dated 7/23/90, no one sought this accreditation.

Dykes was clearly a policy-making administrator, within the meaning of *George v.*

*McIntosh–Wilson,* 582 So.2d 1058, 1063 (Ala. 1991), for all of Eufaula's policies and procedures are signed by Dykes. *See* Dykes depo. at 68–73. Dykes was aware of Eufaula's obligation to work toward JCAH accreditation and was aware of the numerous changes the *Wyatt* Committee believed needed to be implemented. Nonetheless, Dykes did not share all of this information with Dr. Mazick, (Dykes depo. at 38–40), nor did he take other adequate steps to ensure that the *Wyatt* mandate was fulfilled. Whether Dykes and Eufaula were actively seeking JCAH accreditation, and thus constitutional compliance, or whether they were pursuing a mere "paper policy", is a factual issue that precludes summary judgment. *See George,* 582 So.2d at 1063.

Moreover, Dykes knew of the widespread abuse allegedly taking place at Eufaula. *See* 1992 Advocacy Monitoring Report, Pltf. # 7. He knew of reported assaults by the staff, as well as assaults of other students, and of sexual abuse at the center. The affidavits of Billy Kirby, John Fowler, Allen Forte all indicate that abuse was a significant hindrance to treating the residents. *See also* Internal Advocacy Report of Kathy Sawyer, PEx. 11. Yet Dykes took no identifiable steps to prevent the abuse; he also failed to require professional investigations into the allegations of abuse. He allegedly did nothing to eliminate the presence of gangs at Eufaula. In addition, Dykes knew when children were injuring themselves, for he received reports of both threatened injuries and actual ones. Although it was within Dykes' responsibility to cure these ills, Dykes depo. at 68–74, he allegedly took insignificant measures to do so.

Dykes also knew that seclusion was being employed inappropriately at the Center. He received the copy of the Internal advocacy report which outlined numerous hazards associated with the practice of seclusion at Eufaula. Indeed, as far back as September 14, 1988, Kathy Sawyer enjoined Dykes: "Your assistance is needed to help insure that more acceptable seclusion policies and practices are employed at Eufaula. Additionally ... I ask that your Clinical Policy Committee develop a policy in this area...."

PEx. 11, p. 1. No evidence has been submitted that any serious attempt to reform the seclusion policies and facilities was ever undertaken, despite the significance of the problem identified by Kathy Sawyer. A jury could find such inattentiveness constituted deliberate indifference and that *Greason*'s three-prong test for supervisory liability was satisfied.

## 2. *Liability of Emmett Poundstone*

■ Emmett Poundstone was the Associate Commissioner for Mental Health, and as a policy-making administrator, his liability is also governed by *Greason* and *George.* Before becoming the Associate Commissioner, Poundstone became intimately familiar with the *Wyatt* standards as an attorney in the legal division of the Alabama Department of Mental Health. Poundstone was copied on all correspondence of the *Wyatt* Committee.

Poundstone knew of the consent decree requiring that JCAH accreditation be sought for Eufaula, but despite signing the document that indicated obtaining such accreditation was a department goal, no evidence was submitted that Poundstone did anything of significance to achieve this goal. In other respects, there is evidence that Poundstone failed to meet the *Wyatt* standards. Poundstone was aware of the *Wyatt* Committee's findings of "gross inadequacies," but Poundstone simply disagreed with these conclusions. Poundstone depo. at 86. He acknowledged that there were deficiencies in clinical assessments, treatment plans, and psychiatric examinations. Poundstone depo. at 95–99. Poundstone also knew of the seclusion area in Building 112 and that it continued to be used for seclusion despite Kathy Sawyer's condemnation of seclusion practices at Eufaula. PEx. 11.

In addition, Poundstone possessed the Advocacy reports indicating that violence was a routine feature of the Eufaula environment. Poundstone also had access to the complaints filled out by children who were beaten. The evidence submitted on defendant's motion for summary judgment presents a question of whether Poundstone was deliberately indifferent to making the facility reasonably safe

so that the summary judgment motion must be denied.

A revealing example of evidence of Poundstone's indifference is found in his remarks concerning Judge Thompson's statement that "we agreed ... that the Department should develop ... a detailed plan providing both a conceptual framework for children's mental health services and an operational plan to develop needed community based services to end placement at Eufaula." May 1990 letter to Horsley. Poundstone contends that the Department agreed to no such thing, and states that "the Department did not follow through." Poundstone depo. at 107.

The deficiencies indicated by Judge Thompson's letter, the *Wyatt* Committee, and the Child Advocacy Reports were allegedly frequently ignored by Poundstone. Plaintiffs contend that the deficiencies created a non-therapeutic environment in which children, such as David, grew increasingly troubled. The fact-finder would need to determine on a fully developed record whether Poundstone exhibited such a degree of indifference to compliance with the policies of Eufaula, including those prescribed by *Wyatt*, that his administrative decisions were made without the benefit of professional judgment. *George*, 582 So.2d at 1063. The evidence suggests that Poundstone could be found liable in his supervisory capacity under *Greason*'s three-prong test.

### 3. *Liability of Royce King*

■ Because Royce King was the Commissioner of the Department of Mental Health at the time of David's suicide attempt, he was a policy-making administrator whose liability is analyzed under the same rubric as is the liability of Dykes and Poundstone. Despite King's complete lack of clinical training (King was successful in business before becoming a public servant), his primary defense that he cannot be liable because he delegated his responsibility is unpersuasive. Because the duty to know and take responsibility is broader than the explicitly stated law (to which King readily admits his ignorance), King "may take no solace in ostrichism." *Little v. Walker*, 552 F.2d 193, 197 (7th Cir.

1977). A jury is entitled to decide whether King legitimately delegated his responsibilities or whether he actually abandoned them. *See George v. McIntosh–Wilson, supra.*

King's testimony is evidence that he exercised no professional judgment, making no efforts to see that JCAH accreditation was obtained, and making no attempt to ensure that the person who had mentioned attempting to obtain this accreditation (Poundstone) was following through on obtaining the accreditation. King depo. 30–33. From Mr. King's deposition, it does not appear King knew the difference between JCAH standards and the standards that Eufaula met.

King stated that he was "not familiar" with the *Wyatt* Committee and that he had never met with them. King depo. at 35–36. King has read none of the material from the Committee. At no time did King personally investigate as to whether Eufaula met the appropriate standards. *Id.* at 40–41. Moreover, King could not even begin to articulate, in the most general way, what the *Wyatt* standards involved. *Id.* at 50–51. King was only "vaguely familiar" with Eufaula's policies and procedures. *Id.* at 52, 55.

King did receive patient advocacy reports documenting abusive conditions at Eufaula, and he did "scan those." *Id.* at 42–43. King said that he was ill-equipped to understand the reports, and simply relied on his hope that others (such as Poundstone) would take care of any problems. *Id.* at 44. Although King did not know what the *Wyatt* standards consisted of, he was confident that other administrators were carrying them out. *Id.* at 51–52.

King was not familiar with the general admissions criteria at Eufaula. *Id.* at 78. King did not know students were supposed to be free from seclusion imposed for punishment. King took no action to stop improper seclusions.

In numerous respects, King failed to base his administrative decisions on professional judgments. He knew that *Wyatt* controlled Eufaula, but did not know even generally what *Wyatt* required.[8] He received patient

---

8. Because the commands of *Wyatt* are so clear,

and meeting them are within King's responsibili-

Advocate Reports and reviewed them for information, yet failed to take any steps toward insuring that violence was being eradicated, or at least appropriately investigated at Eufaula.[9] *See* FY 1991–93 Annual Monitoring Report, Pltf's # 7. The advocacy report documents incidents of abuse, and is consistent with the affidavits of Kirby and Fowler. King received a copy of the report, reviewed it, but took no action.

King did view his job as managing the budget, upon the recommendation of Poundstone, such that it was his responsibility to ensure that money was spent wisely. However, King was unsure whether he even considered the *Wyatt* orders while making the budget. King depo. p. 79–80. Thus, it appears that King had no real understanding of the clinical needs of Eufaula. He seems to acknowledge that he had no idea whether his budget assisted in the improvement of services at Eufaula or if it was woefully off the mark. As the Eleventh Circuit has aptly stated in the Eighth Amendment context, "[A]n official does not insulate his potential liability for deliberately indifferent actions by instituting a policy of indifference." *Howell v. Evans*, 922 F.2d 712, 723 (11th Cir.1991).

In addition, Dr. Mazick stated that Eufaula's services could be improved through an increased budget. Some defendants have conclusorily pleaded that they could only perform within the bounds set by their limited resources, and that resource limitation may have required a substandard performance. It is possible that a jury could find King liable for the inadequacy of those resources. *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 854 (7th Cir.1990). Indeed, a jury could reasonably find that King acted with deliberate indifference, or in the absence of professional judgment, in relation to David's constitutional rights; that a reasonable person in King's position would have known that his conduct constituted the absence of professional judgment; and that this conduct was causally related to the grossly inadequate care provided to David. *See Greason*, 891 F.2d at 839.

## D. Pendent State Claims

Plaintiff alleges several pendent state claims predicated upon the theories of negligence, wantonness, and *respondeat superior*. All defendants deny that they acted negligently. All defendants argue that they are entitled to discretionary function or substantive governmental immunity from tort liability.

The Supreme Court of Alabama has adopted the rule of immunity propounded by the *Restatement (Second) of Torts,* § 895D (1977), which states that a "public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if ... he is immune because engaged in the exercise of a discretionary function." *See Smith v. King,* 615 So.2d 69, 72 (Ala.1993); *Barnes v. Dale,* 530 So.2d 770, 783 (Ala.1988). While it is true that the court's determination of the existence of substantive immunity "must necessarily turn on the circumstances of each case," *Smith v. Arnold,* 564 So.2d 873, 876 (Ala.1990), the Supreme Court of Alabama has recognized that "the very nature of the mental health profession involves discretion and difficult decision-making." *Id.* at 875. This statement carries particular weight in this case. Because the acts of none of the defendants could be characterized as purely ministerial, and because the actions of all the defendants (including the actions of Dykes, King, and Poundstone who were not trained to make clinical determinations), required the exercise of discretion and difficult decision-making, *id.* at 875–76, defendants' motions for summary judgment on the pendent state claims are due to be granted.

---

ty, *see Cortes–Quinones v. Jimenez–Nettleship,* 842 F.2d 556, 561–62 (1st Cir.1988), the failure to meet these requirements may indicate an abdication of professional judgment and responsibility. *See Cortes,* 842 F.2d at 562–63 (existence of court decree weighs heavily against granting qualified immunity).

**9.** *See, e.g., Howell v. Burden,* 12 F.3d 190 (11th Cir.1994) (finding that question of whether defendant became aware of contents of memorandum was jury question).

940

## III. CONCLUSION

Qualified immunity will be denied for all defendants as to their Section 1983 liability. Substantive immunity will be granted as to all defendants as to their state liability. A separate order will be entered in accordance with this memorandum opinion.